**PINNACLE NURSING HOME; Lakeshore Nursing Home; Fenton Park Nursing Home; Sylcox Nursing Home and Health Related Facility; Nortonian Nursing Home; Elcor Nursing Home; Elcor's Marriott Manor; Waterview Hills Nursing Center, Inc.; Walnut Mountain Care Center; Ridge View Manor Nursing Home; Manor Oak Skilled Nursing Facility, Buffalo; Manor Oak Skilled Nursing Facility, Jamestown; Manor Oak Skilled Nursing Facility, Warsaw; Fenton Park Health Related Facility, doing business as Greenhurst Health Care Center; Oneonta–Richmond, Inc., doing business as Oneonta Nursing Home; Vestal–Johnson, Inc., doing business as Vestal Johnson Nursing Home; Crest Manor Nursing Home; Doanes Nursing Home; Blossom Health Care Center; Pontiac Nursing Home; Brae Loch Manor Health Care Facility; Nor Loch Manor Health Care Facility; Grand Is-**

land Manor Nursing Home; Hornell Nursing Home and Health Related Facility; Hurlbut Nursing Homes; Penfield Nursing Home; Conesus Lake Nursing Home; Elm Manor Nursing Home; Wedgewood Nursing Home; Westgate Nursing Home; Woodside Manor Nursing Home, Inc.; Newark Manor Nursing Home; Avon Nursing Home; Valley View Manor Nursing Home, Appellees/Cross–Appellants,

v.

David AXELROD, M.D., as Commissioner of Health of the State of New York; Cesar Perales, as Commissioner of Social Services of the State of New York; Dall Forsythe, as Director of the Budget of the State of New York, Appellants/Cross–Appellees.

Nos. 1090, 1091, 1192, 1193, Dockets 90–6295, 90–6297, 90–6307, 90–6313.

United States Court of Appeals, Second Circuit.

Argued Feb. 19, 1991.

Decided March 25, 1991.

Thomas G. Smith, Rochester, N.Y. (Ross P. Lanzafame, Carol O'Keefe, and Harter, Secrest & Emery, Rochester, N.Y., on the brief) for appellees/cross-appellants Pinnacle Nursing Home, et al.

Michael A. Rosenbloom, Rochester, N.Y., for appellee/cross-appellant Valley View Manor Nursing Home.

Clifford A. Royael, Albany, N.Y. (Robert Abrams, Atty. Gen. of the State of New York, Peter H. Schiff, Deputy Sol. Gen., Peter G. Crary, Asst. Atty. Gen., Albany, N.Y., on the brief) for appellants/cross-appellees.

Before FEINBERG, TIMBERS, and MINER, Circuit Judges.

TIMBERS, Circuit Judge:

Appellants David Axelrod, M.D., Commissioner of Health of the State of New York; Cesar Perales, Commissioner of Social Services of the State of New York; and Dall Forsythe, Director of the Budget of the State of New York (collectively the state) appeal from a final amended judgment entered October 9, 1990 in the Western District of New York, Michael A. Telesca, *Chief Judge*, declaring null and void on procedural grounds the 1987 adjustment to the Medicaid reimbursement methodology utilized by the state (1987 Adjustment); dismissing a substantive challenge to the 1987 Adjustment; and not reaching a constitutional challenge to the 1987 Adjustment. The federal defendant, Secretary of the United States Department of Health and Human Services (Secretary), does not join in this appeal. Plaintiffs, various residential health care facilities or nursing homes (collectively nursing homes) located throughout New York State, cross-appeal from that judgment. This appeal also brings up for review the non-final decision and order entered by the court on August 15, 1989. *Pinnacle Nursing Home v. Axelrod*, 719 F.Supp. 1173 (W.D.N.Y.1989).

On appeal, the state contends that the 1987 Adjustment comports with the procedural requirements of the Medicaid Act. On cross-appeal, the nursing homes contend that the 1987 Adjustment constitutes a substantive violation of the Medicaid Act and a constitutional violation of their right to equal protection.

For the reasons which follow, we affirm that part of the district court's order and final judgment which held that the 1987 Adjustment fails to satisfy the procedural requirements of the Medicaid Act. We vacate the district court's dismissal of the nursing homes' substantive and constitutional claims. We remand the case with instructions to reinstate those claims and to proceed in accordance with this opinion.

I.

We summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal. At the outset, we also summarize briefly the relevant aspects of the Medicaid scheme.

(A)

The Medicaid Program (the Act) was established pursuant to title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.* (1988). It establishes a joint federal and state cost-sharing system to provide necessary medical services to indigent persons who otherwise would be unable to afford such care. Participation in this system is optional. Once a state does decide to participate, however, it must abide by certain requirements imposed by the Act and regulations promulgated thereunder. To qualify for federal reimbursement, a state must submit to the Secretary for approval a plan for medical assistance. 42 U.S.C. § 1396a(b). This plan "is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of title XIX, the regulations in ... Chapter IV [of the Code of Federal Regulations], and other applicable official issuances of the Department." 42 C.F.R. § 430.10 (1987). Upon approval of a state plan by the Secretary, the state is entitled to receive reimbursement from the federal government for a percentage of the funds it pays to residential health care facilities which provide medical assistance to Medicaid recipients. 42 U.S.C. § 1396b(a). The remainder of the costs under the Medicaid Program are borne by state and local governments.

The Medicaid reimbursement methodology has undergone a metamorphosis since its enactment in 1965. When enacted, the Act required reimbursement of the "reasonable cost" of in-patient services rendered to Medicaid patients in nursing and intermediate care facilities. In 1972, Congress modified this "reasonable cost" standard in response to a perception that the Secretary exercised too much control over reimbursement rates. *See Wilder v. Virginia Hosp. Ass'n,* —— U.S. ——, 110 S.Ct. 2510, 2515 (1990). The new law required states to reimburse "the reasonable cost[s] ... as determined in accordance with methods and standards which shall be developed by the State and reviewed and approved by the Secretary." *Id.* (quoting Pub.L. 92–603, § 232(a), 86 Stat. 1329, 1410–11 (1972)). Its enactment marked the beginning of congressional efforts to provide the states with greater flexibility to develop their own schemes of reimbursement. This trend continued with the enactment of the Boren Amendment in 1980. 42 U.S.C. § 1396a(a)(13)(A). *See* Omnibus Budget Reconciliation Act of 1980, Pub.L. 96–499, § 962(a), 94 Stat. 2650. The Boren Amendment repealed the "reasonable cost" standard of reimbursement existing under the prior law, replacing it with a standard which required reimbursement at rates that "are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities". 42 U.S.C. § 1396a(a)(13)(A). As currently formulated, the Boren Amendment provides that a state plan for medical assistance must

"provide ... for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality...."

*Id.*

The Boren Amendment was enacted with two specific purposes in mind: (1) to provide the states with greater flexibility in developing methods of reimbursing skilled nursing facilities, intermediate care facilities, and inpatient hospital services; and (2)

to increase the economy and efficiency of all plans. S.Rep. No. 139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 744; *see also Colorado Health Care Ass'n v. Colorado Dep't of Social Servs.*, 842 F.2d 1158, 1165 (10 Cir.1988). "The flexibility given the States[, however, was] not intended to encourage arbitrary reductions in payment that would adversely affect the quality of care." S.Rep. No. 139, *supra*, at 744.

The regulations promulgated under the Act require that a state make findings "[w]henever the Medicaid agency makes a change in its methods and standards, but not less often than annually...." 42 C.F.R. § 447.253(b). Pursuant to that regulation, a state must find that "[t]he Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers...." 42 C.F.R. § 447.253(b)(1)(i).

### (B)

Since New York elected to participate in the Medicaid Program, it was required to abide by the Boren Amendment and the regulations promulgated thereunder. *Harris v. McRae*, 448 U.S. 297, 301 (1980); *AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs.*, 879 F.2d 789, 794 (10 Cir. 1989), *cert. denied*, 110 S.Ct. 3212 (1990). Article 28 of the New York Public Health Law charges the New York State Department of Health (DOH) with the responsibility for setting Medicaid reimbursement rates for nursing homes. N.Y.Pub.Health Law § 2808 (McKinney 1990). In 1986, apparently in response to the Boren Amendment, New York set its Medicaid reimbursement rates prospectively adjusted for inflation, based on historic 1983 costs incurred by nursing homes throughout the state. This reimbursement methodology is set forth in subpart 86–2 of the

Commissioner's Administrative Rules and Regulations. N.Y.Comp.Codes R. & Regs. tit. 10 § 86–2 (1988). The Supreme Court recently has recognized that such reimbursement methods are typical of those formulated by the states after the enactment of the Boren Amendment:

"Before the passage of the Boren Amendment,' state plans provided for reimbursement on a retrospective basis; that is, health care providers were reimbursed according to the reasonable cost of services *actually* provided. Since the passage of the Boren Amendment in 1981, however, most States have adopted plans that are prospective in nature...."

*Wilder, supra,* —— U.S. at ——, 110 S.Ct. at 2516 n. 7 (1990) (emphasis in original).

As an element of its 1986 plan, New York adopted the Regional Direct Input Price Adjustment Factory ("RIPAF") in order to "neutralize[ ] the difference in wage and fringe benefit costs between and among the regions [of New York State]". N.Y.Comp.Codes R. & Regs. tit. 10, § 86–2.10(c)(3)(i). Pursuant to RIPAF, New York State was divided into sixteen geographic regions based on common labor pools. An average wage rate was then calculated for each region using 1983 as the base year. Reimbursement within each region was based on that average rate. The theory behind RIPAF was that facilities within each region should have comparable labor costs. The 1986 RIPAF methodology was fully approved by the Health Care Financing Administration (HCFA) (the federal agency charged by the Department of Health and Human Services with reviewing Medicaid plans). It is not being challenged in the instant action.

### (C)

By letter dated October 31, 1986, ten months after the 1986 RIPAF methodology had been implemented, DOH advised nursing homes throughout New York that the 1986 RIPAF would be altered. Commencing January 1, 1987, DOH would effect the "1987 Adjustment to RIPAF". DOH explained that the 1987 Adjustment would create "an average statewide positive or

negative 10% corridor" around the previously established regional average wage rates. The Adjustment provided that all homes whose actual 1983 costs fall within the specified "corridor" would no longer be reimbursed based on the regional average wage rate, but rather upon a portion of each facility's actual reported 1983 wage rate.

DOH justified the 1987 Adjustment by stating that the 1986 RIPAF methodology had "created a situation wherein facilities in the region with the highest dollar per hour [wage rate] were adversely affected, while facilities with the lowest dollar per hour were aided". Sometime thereafter, apparently subsequent to the commencement of this action, the state advanced a somewhat modified explanation for the change. The state now suggests that the 1987 Adjustment was made to assist "publicly owned facilities whose higher labor costs resulted from historical factors beyond their control (*e.g.*, mandated fringe benefits, such as pension contributions)." The state did not dispute below, however, "that the 1987 Adjustment also benefit[ed] any other high-cost residential nursing home facility, regardless of the cause of its respective high costs, at the expense of lower-cost facilities, such as plaintiffs'."

Although the state informed nursing homes of the proposed implementation of the 1987 Adjustment in October 1986, the new plan was not submitted to the federal government until April 1, 1987. At that time, the state notified HCFA that the 1987 Adjustment was not a "significant change" since it was budget neutral, affecting not the amount of Medicaid funds, but merely its allocation. Accordingly, the state contended that the 1987 Adjustment did not constitute an amendment which required prior notice to and approval of HCFA as required by 42 C.F.R. § 447.253. HCFA specifically challenged New York's characterization and formally advised the state that additional information would be required before the 1987 Adjustment would be approved. New York failed to comply with HCFA's request until November 1988, when it was compelled to do so by a New York State Supreme Court order in a related action.

After reviewing New York's final response, HCFA again informed the state that its 1987 Adjustment constituted a "significant change" which, under federal regulations, required New York to provide "adequate assurances" and related information. HCFA further advised New York that its November 1988 submission was deficient and that the 1987 Adjustment would be disapproved. By letter dated February 7, 1989, New York notified HCFA that assurances which had been submitted to HCFA in March 1987, in support of an unrelated change in New York's Medicaid plan, also constituted assurances in support of the 1987 Adjustment. On February 21, 1989, based on those assurances, HCFA approved the 1987 Adjustment, effective retroactively to January 1, 1987.

In June 1989, the nursing homes commenced actions in the federal court against the state and the Secretary, alleging that the 1987 Adjustment was procedurally and substantively violative of the Medicaid Act and their right to equal protection under the federal and state constitutions. The nursing homes moved for a preliminary injunction to enjoin the state from applying the reimbursement method required by the 1987 Adjustment and to compel the state to return to the 1986 RIPAF reimbursement scheme. In the alternative, the nursing homes moved for summary judgment. The Secretary also moved for summary judgment.

In an order dated August 15, 1989, the district court granted the nursing homes' motion for a preliminary injunction and partially granted their motion for summary judgment insofar as it sought a declaration that the 1987 Adjustment to New York's Medicaid reimbursement methodology was enacted without complying with federally mandated procedures. Accordingly, the court declared the 1987 Adjustment "null and void" and ordered the state to reimburse the nursing homes in accordance with the 1986 RIPAF methodology. It denied the nursing homes' and Secretary's

motions for summary judgment in all other respects, with leave to renew upon completion of discovery.

In reaching its holding that the 1987 Adjustment procedurally violated the Boren Amendment, the court found that it was "adopted by the State and submitted to HCFA without the findings and assurances mandated by Federal law." 719 F.Supp. at 1182. After painstakingly comparing the applicable federal regulations and the assurances submitted by the state, the court concluded that the assurances were "patently and painfully insufficient, constituting nothing more than a formalistic recitation of the federally mandated requirements of a Medicaid Plan." *Id.* at 1179–80. Accordingly, the court found that HCFA's approval of the Adjustment violated the Act and was without legal effect. The court held that it could not "find as a matter of law that the substance of the 1987 Adjustment violates either the Social Security Act or the plaintiffs' constitutional right to equal protection." *Id.* at 1181. The court assumed that the substantive issue "must be determined after discovery, if not at trial." *Id.*

Thereafter, the action proceeded through discovery. Upon completion of discovery, the nursing homes moved for summary judgment on the remaining substantive and constitutional issues. The state and federal defendants cross-moved for summary judgment and for reconsideration of the court's order of August 15, 1989.

In an order dated October 5, 1990, the court denied the parties' motions for summary judgment and the federal and state defendants' motions for reconsideration. It dismissed the action. The court reaffirmed and clarified its previous order of August 15, 1989, which found that the 1987 Adjustment constituted a procedural violation of the Boren Amendment. It held that "[t]he State's failure to make ... federally mandated findings is a violation of the Boren Amendment." The court declined to find a substantive violation, however, since the evidence submitted was insufficient to make such a determination. Having failed to find a substantive violation, the court summarily dismissed the substantive claim "[i]n deference to the federally mandated priority of the states to determine their own Medicaid plans". Since the court declared the 1987 Adjustment invalid on procedural grounds, it found no reason to address the nursing homes' constitutional challenge.

On appeal, the state contends that the court erred in holding that the 1987 Adjustment procedurally violated the Boren Amendment. The Secretary does not join in this appeal. On cross-appeal, the nursing homes argue that the 1987 Adjustment violated the substantive provisions of the Boren Amendment and the equal protection clauses of the federal and state constitutions.

## II.

Since this is an appeal from a summary judgment, we must review the record *de novo* to determine whether there is a genuine issue of material fact and whether the law was applied correctly. *City of Yonkers v. Otis Elevator Co.,* 844 F.2d 42, 45 (2 Cir.1988) (citing 10 Wright, Miller & Kane, Federal Practice and Procedure § 2716, at 654 (1983)). We apply "the same standard as that employed by the trial court pursuant to Fed.R.Civ.P. 56(c)." *City of Yonkers, supra,* 844 F.2d at 45. The record is assessed in the light most favorable to the non-movant, drawing all factual inferences in its favor. *Delaware & Hudson Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 177 (2 Cir.), *petition for cert. filed,* No. 90–380 (Sept. 4, 1990).

## III.

Before reaching the merits of the claims before us, we first set forth the standard which guides us in reviewing the validity of agency action. At the outset, we recognize that New York's Medicaid reimbursement plan is the product of legislative and policy decisions made at the federal and state levels. Congress has implemented this scheme and charged HCFA, through the United States Department of Health and Human Services, with reviewing Medicaid plans. 42 U.S.C. § 1396a(a)(4). Congress

also has accorded the state flexibility in devising reimbursement schemes under the Act. S.Rep. No. 139, *supra,* at 744. The 1987 Adjustment involved here was approved by both the New York State Department of Health and the HCFA. Since we are not merely considering a *state* agency's determination of procedural and substantive compliance with federal law, *see Turner v. Perales,* 869 F.2d 140, 141 (2 Cir.1989), our review is narrow. It is well established that our review of non-adjudicatory actions of a federal agency is limited to ascertaining whether the action was "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971) (quoting Administrative Procedure Act, 5 U.S.C. § 706(2)(A)). Since the HCFA put its imprimatur on the state administrative action, even though it subsequently did not join in this appeal, we review the 1987 Adjustment deferentially to determine compliance with the Boren Amendment.

### IV.

#### (A)

This brings us to the state's contention that the district court erred in finding a procedural violation of the Boren Amendment. The state argues that both the findings and assurances it provided to HCFA comported with the Boren Amendment. The state also contends that the district court's holding would dictate results never envisioned by Congress.

In finding a procedural violation of the Boren Amendment, the district court held that the state's assurances were deficient because, while they tracked the language of the Boren Amendment, they did absolutely nothing more. In short, the state's assurances provided the district court with "no basis for concluding that the proposed change in the Medicaid reimbursement plan comported with the Boren Amendment." Moreover, the district court concluded that the state's findings were inadequate because they failed to establish a nexus between the efficient and economic operation of health care facilities and their respective wage rates. We agree.

In order to receive HCFA's approval of a change in payment methods and standards pursuant to a state Medicaid plan, the Act and the regulations promulgated thereunder require a state to submit to the Secretary assurances, based on findings made by the state, that its Medicaid plan complies with federal requirements for such plans. 42 U.S.C. § 1396a(a)(13)(A); 42 C.F.R. § 447.253. Specifically, the state must set reimbursement rates which it finds are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities...." 42 U.S.C. § 1396a(a)(13)(A). We recognize that the state need not submit its findings to HCFA; it need only submit assurances that, based on its findings, all requirements of § 1396 have been met. *AMISUB, supra,* 879 F.2d at 795. Before the assurances can be made, however, the state *must* engage in a findings process. *Id.* at 796.

The state argues that the findings required by the district court are "additional and rigid procedural requirements" which are not mandated by the Act. Moreover, the state contends that the requirements imposed by the district court would reduce the state's flexibility in developing reimbursement schemes, increase "unnecessary and burdensome paperwork", and thrust the courts into an administrative oversight role. It insists that none of these results were envisioned by Congress. The state, in effect, invites us to disregard the procedural requirements of the Boren Amendment.

We decline the state's invitation to read the procedural requirements of the Boren Amendment as mere surplusage. The Supreme Court recently dispelled this notion, reconfirming that the procedural requirements of the Boren Amendment were intended to be observed. In *Wilder, supra,* — U.S. at ——, 110 S.Ct. at 2519 n. 11, responding to an argument of the United States that assurances do not give rise to enforceable rights, the Court reaffirmed

the necessity of findings and assurances under the Boren Amendment:

"the language of the statute ... requires a State to *find* that its rates are 'reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities'.... See also 42 C.F.R. § 447.253(b) (1989); 48 Fed.Reg. 56051 (1983) ('The statute requires that the States make a finding that their payment rates are reasonable and adequate to meet the costs of efficiently and economically operated facilities'). The requirement that a State make such a finding is a necessary prerequisite to the subsequent requirement that the State provide 'assurances' to the Secretary. That the requirements are separate obligations is apparent from the Secretary's regulations.... Moreover, the Secretary's interpretation of his role under the statute—that he will review the reasonableness of the assurances presented by a State rather than the findings themselves—is based entirely on his understanding that a State has the responsibility to *find* that its rates are adequate before making assurances to the Secretary. See 48 Fed.Reg. 56050 (1983)." (emphasis in original).

In light of the abundant evidence demonstrating that Congress intended that the procedural requirements be followed, the state's argument that "findings" are not mandatory is fatally flawed. That conclusion is reinforced by the mandatory, rather than precatory, language of the statute itself. 42 U.S.C. § 1396a(a)(13)(A) ("[a] State plan for medical assistance *must*" provide for payment of rates which the state *finds* are reasonable and adequate (emphasis added)). Although procedural requirements may reduce some of the state's "flexibility" in determining their own schemes of reimbursement, this is what the plain language of the statute requires.

■ Furthermore, contrary to the state's contentions, our review of HCFA's actions in this case will not result in displacing the Secretary in his administrative oversight capacity. We review the agency's actions merely to ensure compliance with federal

law. As indicated previously, we do not read the scope of our review as being limited to rubber stamping agency action. When a federal agency has erred as a matter of law, it is within our domain to say so. Indeed, in reviewing agency action, our mandate under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, is clear: "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... not in accordance with law ... [or] without observance of procedure required by law". 5 U.S.C. § 706(2)(A) & (D); *see also* Part III of this opinion, *supra.* We do not find in the language of the Act or its legislative history a congressional declaration that we abdicate our duty as ultimate arbiter of federal law.

### (B)

■ Having concluded that Congress intended that the procedural requirements be adhered to, we now consider whether the state's findings and assurances satisfied the requirements of the Boren Amendment. We first address the adequacy of the state's findings.

In determining the adequacy of the state's findings, we are guided by the language of the statute:

"[t]he plain language of federal Medicaid law mandates the State Medicaid Agency, *at a minimum,* to make 'findings' which identify and determine (1) efficiently and economically operated hospitals; (2) the costs that must be incurred by such hospitals; and, (3) payment rates which are reasonable and adequate to meet the reasonable costs of the state's efficiently and economically operated hospitals."

*AMISUB, supra,* 879 F.2d at 796 (emphasis in original). In other words, the state must make findings which establish a nexus between the costs of operating efficient and economic nursing facilities and the proposed reimbursement rates under the state plan. While the method used by a state in formulating these findings admits some flexibility, it is an absolute necessity that

such findings be made. *Wilder, supra,* —— U.S. ——, 110 S.Ct. at 2516 ("[s]tates should determine the factors to be considered in determining what rates are 'reasonable and adequate' to meet the costs of 'efficiently and economically operated facilit[ies]' "); *AMISUB, supra,* 879 F.2d at 797 ("[w]hile it is true that a state is free to create its own method for arriving at the required findings, this does not absolve the state from making the required findings"). Moreover, the findings must be correct, i.e., they must show that the rates are reasonable and adequate to meet the costs of efficiently and economically operated facilities. *Wilder, supra,* —— U.S. ——, 110 S.Ct. at 2520 ("[i]t would make little sense for Congress to require a State to make findings without requiring those findings to be correct"). Examining the record in the light most favorable to the state, we agree with the district court and conclude that the state's findings are inadequate.

In its order of October 5, 1990, the district court reiterated the state's justification for the 1987 Adjustment:

> "[it] was made to reduce the impact of the RIPAF on high cost facilities which, instead of receiving reimbursement based purely on the regional average, now would receive reimbursement based on a regional average mitigated by their actual wage rates.... Many of [these] higher cost facilities are unionized public institutions and [RIPAF] caused them financial distress which was made known to the [New York State] Department of Health. The financial hardship sustained by these facilities was claimed to result from historical factors beyond the control of publicly owned facilities (e.g. mandated fringe benefits, such as pension contributions). A statement by the New York State Association of Counties indicated that the counties were considering selling their facilities and withdrawing from the provision of residential health care. These concerns were addressed by the development of [the 1987 Adjustment.]"

The state offers little else in terms of findings. The two page RIPAF calculation submission of the state does little to reme-dy the lack of findings. Indeed, it creates as many questions as it answers and falls far short of what is required under the Boren Amendment.

In short, the state does not begin to identify "efficient and economically" operated facilities, the costs incurred by such facilities, or what rate would be "reasonable and adequate" to compensate those facilities. The 1987 Adjustment was implemented based on the finding that facilities with high labor costs were adversely affected under the former methodology. When the smoke of litigation clears, it is apparent that the 1987 Adjustment was little more than a policy decision to reimburse high cost facilities unsupported by any findings whatsoever. It is clear that "[f]ederal law is not satisfied if a state merely makes conceptual policy decisions." *West Virginia Univ. Hosps., Inc. v. Casey,* 885 F.2d 11, 30 (3 Cir.1989), *cert. granted,* 110 S.Ct. 1294 (1990).

We hold that the state failed to make proper findings as required by the Boren Amendment and its implementing regulations.

### (C)

■ We next address the adequacy of the assurances submitted to HCFA. In thoroughly analyzing the assurances submitted by the state, the district court found that they do little more than duplicate the language of the applicable regulation. Furthermore, the court found that the assurances were based on inadequate findings. We agree.

Although the Act does not require a state to submit findings to the HCFA, *see Colorado Health Care Ass'n, supra,* 842 F.2d at 1168, it does demand that the State submit assurances based on specific findings, 42 U.S.C. § 1396a(a)(13)(A); 42 C.F.R. § 447.253(a) & (b); *see also Casey, supra,* 885 F.2d at 29–30; *AMISUB, supra,* 879 F.2d at 796. Since the assurances are unsupported by sufficient findings, *see* Part IV(B) of this opinion, *supra,* the state has failed to satisfy the requirements of the Act and the

regulations promulgated thereunder. 42 U.S.C. § 1396a(a)(13)(A); 42 C.F.R. § 447.253; *see also Casey, supra,* 885 F.2d at 30.

We hold that the 1987 Adjustment is violative of the procedural requirements of the Boren Amendment and its implementing regulations. Having determined that the state violated the Boren Amendment, we hold that the 1987 Adjustment is null and void. *Nebraska Health Care Ass'n v. Dunning,* 778 F.2d 1291, 1294 (8 Cir.1985), *cert. denied,* 479 U.S. 1063 (1987). Our holding today is buttressed by the fact that HCFA has stood mute during this appeal. Had HCFA believed that the 1987 Adjustment complied with the Act, we assume that it would have joined in this appeal.

### V.

■ We turn next to the nursing homes' contention, advanced on the cross-appeal, that the 1987 Adjustment substantively violated the Boren Amendment. The nursing homes contend that the state failed to set reimbursement rates that are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities.

In addressing this contention, the district court concluded that neither party had submitted evidence sufficient to determine whether the 1987 Adjustment substantively violated the Boren Amendment. While the court did acknowledge that current reimbursement levels do not cover the nursing homes' actual expenses, it could not conclude, based on the evidence submitted, whether the 1987 Adjustment "reimburse[d] inefficient, uneconomic facilities and/or fail[ed] to reimburse efficient, economic facilities...." These factual disputes, among others, precluded the district court from determining whether the 1987 Adjustment constituted a substantive violation of the Boren Amendment. It therefore denied both sides' summary judgment motions.

Examining the record on appeal, we conclude, for substantially the same reasons as the district court did, that it was appropriate to deny the motions for summary judgment. The record is devoid of suffi-cient facts to determine whether the 1987 Adjustment sets reimbursement rates which are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers. Part of this deficiency undoubtedly stems from the state's failure to make proper findings in the first instance. In any event, numerous issues of material fact were unresolved, mandating denial of the summary judgment motions.

While we agree with the district court's denial of the summary judgment motions on the substantive claim, we cannot discern on what principled basis the court ultimately disposed of this issue. After declining to grant summary judgment in favor of either side, the district court summarily dismissed the nursing homes' substantive challenge to the 1987 Adjustment "[i]n deference to the federally mandated priority of the states to determine their own Medicaid plans." The summary disposition of this issue is contrary to the established practice under Fed.R.Civ.P. 56. We hold that dismissing the claim in this manner was inappropriate.

The Supreme Court has summarized succinctly the effect of denying a summary judgment motion: "the denial of a motion for summary judgment because of unresolved issues of fact does not settle or even tentatively decide anything about the merits of the claim. It is strictly a pretrial order that decides only one thing—that the case should go to trial." *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.,* 385 U.S. 23, 25 (1966). The district court's avowed basis for dismissing this action—deference to the state's right to determine its own Medicaid plan—is unpersuasive in light of the substantive rights accorded to the nursing homes under the Boren Amendment. "A surmise or belief, no matter how reasonably entertained, that a party cannot prevail upon a trial, will not justify refusing him his day in court with respect to material issues which are not clearly shown to be sham, frivolous, or so unsubstantial that it would obviously be futile to try them." *Ford v. Luria Steel &*

*Trading Corp.,* 192 F.2d 880, 882 (8 Cir. 1951).

Without expressing a view on the merits of this issue, we hold that the nursing homes' substantive claim should be reinstated for further proceedings in the district court. Although the court has declared the 1987 Adjustment void on procedural grounds, that does not prevent the state from making the proper findings and resubmitting the plan to HCFA. As it now stands, the nursing homes are left with no case below should that eventuality occur. They would be relegated to commencing a new action.

We therefore vacate the judgment of the district court to the extent that it dismisses the substantive claim and remand for reinstatement in the district court.

## VI.

■ This brings us to the nursing homes' contention that, "[s]ince the 1987 Adjustment to RIPAF results in Medicaid reimbursement rates that profit New York City homes while failing to adequately reimburse homes outside that region, it violates the Equal Protection Clauses of the federal and state constitutions."

As a threshold matter, we acknowledge that the breadth of coverage under the equal protection clauses of the federal and state constitutions is equal. *People v. Smith,* 97 Misc.2d 115, 411 N.Y.S.2d 146, 149 (Albany County Ct.1978) (citing *Dorsey v. Stuyvesant Town Corp.,* 299 N.Y. 512, 87 N.E.2d 541 (1949), *cert. denied,* 339 U.S. 981 (1950)). We therefore apply federal law to determine whether the 1987 Adjustment violates the nursing homes' state and federal rights to equal protection. Since suspect classifications such as race, religion or national origin are not involved here, we apply the "traditional" equal protection analysis. "Under 'traditional' equal protection analysis, a legislative classification must be sustained unless it is 'patently arbitrary' and bears no rational relationship to a legitimate governmental interest." *Frontiero v. Richardson,* 411 U.S. 677, 683 (1973). Whether a state's classifications

are unconstitutional is generally a question of reasonableness:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78. 'The problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific.' *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70. 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *McGowan v. Maryland,* 366 U.S. 420, 426."

*Dandridge v. Williams,* 397 U.S. 471, 485 (1970). In short, government regulation in the area of economics and social welfare "carries with it a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality". *Hodel v. Indiana,* 452 U.S. 314, 331–32 (1981).

In the instant case, having found that the 1987 Adjustment procedurally violated the Boren Amendment, the district court failed to address the nursing homes' equal protection claim. This leaves us with an undeveloped factual record to decide this claim on appeal. It is a general rule that a "federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff,* 428 U.S. 106, 120 (1976). Only in exceptional circumstances such as when the proper resolution of a claim is not in doubt, or where injustice might otherwise result, will an appellate court be justified in resolving an issue not decided below. *Id.* at 121 *Americans Disabled for Accessible Public Transp. v. Skinner,* 881 F.2d 1184, 1197 (3 Cir.1989). Since we are without a sufficient factual record to apply the relevant legal principles, we decline to decide this issue on appeal.

In the same breath, however, and for substantially the same reasons as discussed in Part V of this opinion, *supra,* we assume that the nursing homes are entitled to a determination of whether the substance of the 1987 Adjustment violated their constitutional right to equal protection. A finding of a procedural deficiency does not render the substance of the 1987 Adjustment a nullity. If the state subsequently submits proper findings concerning the 1987 Adjustment, the nursing homes will be forced to initiate an entirely new action. For this reason, we vacate the judgment of the district court to the extent it dismissed the nursing homes' constitutional claim and remand for further proceedings consistent with this opinion.

### VII.

To summarize:

We hold that the 1987 Adjustment was enacted without complying with the procedural requirements of the Boren Amendment. Accordingly, it is declared null and void until such time that proper findings are submitted and approved by HCFA. We further hold that, while it was proper to deny summary judgment on the nursing homes' claim that the 1987 Adjustment substantively violated the Boren Amendment, it was inappropriate summarily to dismiss that claim upon denying summary judgment. The nursing homes are entitled to a determination of whether the 1987 Adjustment substantively violated the Boren Amendment. For substantially the same reason, it was improper to dismiss the nursing homes' constitutional claim. We vacate the district court judgment as to the substantive and constitutional claims, and remand the case for further proceedings in accordance with this opinion, if, and when, the state submits proper findings as required by the Boren Amendment.

Affirmed in part; vacated and remanded in part.