**RYE PSYCHIATRIC HOSPITAL CENTER, INC., Plaintiff,**

v.

**Richard C. SURLES, Commissioner of the Office of Mental Health of the State of New York, and Cesar A. Perales, Commissioner of the State of New York Department of Social Services, Defendants.**

No. 88 Civ. 5922(GLG).

United States District Court,
S.D. New York.

July 2, 1991.

Shanley & Fisher, New York City (Frederick A. Nicoll, Charles D. Donohue, of counsel), Bleakley Platt & Schmidt, White Plains, N.Y., for plaintiff.

Robert Abrams, Atty. Gen. of State of N.Y., New York City (William K. Sanders, of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

This action presents a challenge to New York's Medicaid reimbursement rates as they are applied to private psychiatric hospitals located within the state.

## I. FACTS

Medicaid is a federal/state program through which the federal government offers financial assistance to enable needy individuals to obtain health care. 42 U.S.C. § 1396 *et seq.* (1988). *See generally Wilder v. Virginia Hosp. Ass'n,* — U.S. —, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (discussing Medicaid program); *Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306 (2d Cir.1991) (same). The federal government only provides a portion of the necessary funding, with the remainder to be made up by the states and localities. If a state wishes to participate in the Medicaid program, it must comply with federal regulations promulgated by the Department of Health and Human Services ("HHS").[1] Included among these regulations is the mandate that the state establish a comprehensive reimbursement scheme for health care providers. The reimbursement methodology has undergone dramatic changes since the Medicaid Act's inception, with a very significant amendment occurring in 1980. This amendment to the Medicaid Act, known as the Boren Amendment (the "Amendment"), states that, *inter alia,* "[a] State plan for medical assistance must provide for payment . . . of the hospital services . . . provided under the plan through the use of rates . . . which the State finds, and makes assurances satisfactory to the Secretary [of HHS], are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A).[2] This is not simply a one shot deal. Rather, the states are required, "not less often than annually," 42 C.F.R.

---

1. The Health Care Financing Administration actually is charged by HHS with reviewing Medicaid plans. For ease of comprehension, however, we will simply refer to HHS.

2. While the Amendment passed in 1980, it was not until 1981 that its provisions were extended to hospitals. Previously, its provisions were limited to nursing and intermediate care facilities. *See Wilder,* 110 S.Ct. at 2513 n. 2.

§ 447.253(b)(1), to make findings that its rates are reasonable and adequate. *See Wilder*, 110 S.Ct. at 2516.

The rationale behind the Amendment was to provide states with greater flexibility in setting reimbursement rates and to promote efficiency and economy. *See Pinnacle Nursing Home*, 928 F.2d at 1309–10.[3] In response to the Amendment, New York adopted the reimbursement schedules at issue. Specifically, the question in the case at bar relates to the established rates for private psychiatric hospitals in the state, of which there are eleven, seven of which accept Medicaid patients. We note that while New York's Department of Social Services ("DSS") administers the state's overall participation in the Medicaid program, it is the Office of Mental Health ("OMH") that is responsible for setting the reimbursement rates for private psychiatric hospitals.

Among the most important changes OMH adopted in response to the Amendment was the adoption of a "minimum utilization adjustment" (the "Adjustment"). *See* 14 N.Y.C.R.R. § 577.7(g). The Adjustment, which ultimately became effective on June 1, 1984, works as follows. If a hospital operates at seventy-five percent capacity or greater, its per diem reimbursement rate is calculated by dividing its allowable costs by its actual number of patient days. However, a hospital operating at less than seventy-five percent capacity will have its costs divided by seventy-five percent of its certified capacity regardless of the actual number of patient days. Thus, the permissible costs are divided by a greater number of beds than were actually utilized during the base year, which is two years before the rate year. This results in a decreased per diem reimbursement rate for hospitals operating at less than seventy-five percent capacity. While there are obviously other provisions articulated in the state's reimbursement regulations, it is the Adjustment that is of paramount concern to plaintiff.[4]

Plaintiff Rye Psychiatric Hospital Center, Inc. has now sued the respective heads of both OMH and DSS for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 (1988), claiming that the state's plan violates both the Boren Amendment and the regulations promulgated thereunder, as well as the equal protection and due process clauses of the Constitution. While at the time this suit was filed it was unclear whether an action under section 1983 could appropriately raise violations of the Boren Amendment, the Supreme Court's decision in *Wilder v. Virginia Hospital Association*, —— U.S. ——, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), definitively recognizes such a claim.[5]

Presently before us are cross-motions for summary judgment. For reasons which will become apparent, we need not resolve each of the plaintiff's claims and arguments. However, we will briefly list them for the sake of completeness. As noted, plaintiff's claim focuses on the rates established by OMH, specifically the Adjustment. Plaintiff argues that defendants' failure to conduct any formal studies, as required by the Amendment, before implementing the new reimbursement rates violates the Amendment. Going hand in hand

---

3. When the Medicaid Act was initially enacted, reimbursement rates were calculated on a reasonable cost-related basis. Thereafter, however, in response to challenges that the federal government was too deeply involved in state reimbursement practices, the Medicaid Act was amended to provide states with greater flexibility. The Boren Amendment represents a further development of this policy. *See Pinnacle Nursing Home*, 928 F.2d at 1309 (discussing metamorphosis of reimbursement under Medicaid).

4. Before the new provisions became effective, OMH published them in the New York State Register and solicited comments of the private psychiatric hospitals in the state. Notwithstand-

ing Rye's objections, the provisions went into effect. In addition, on June 28, 1984, as required by the Amendment, DSS submitted the proposed changes to HHS, which accepted the state's assurances that the changes complied with all necessary statutes and regulations. On November 16, 1984, DSS was notified by HHS that its amendments had been accepted.

5. Plaintiff's claim for damages based on the reimbursement rates has been abandoned in recognition of the eleventh amendment's prohibition against such actions. We are told that an action for damages is pending in state court, although it has been stayed pending resolution of the instant litigation.

with this argument, of course, are the claims that the rates are neither reasonable nor adequate, nor do they result in economically and efficiently operated hospitals. Defendants, while admitting that no formal studies were conducted, suggest that none were necessary in light of the state's prior experience with minimum utilization adjustments, as well as the general acceptance of such adjustments in the community as a means of encouraging efficiency.

Plaintiff also claims that while the Amendment requires states to "take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs," 42 U.S.C. § 1396a(a)(13)(A), defendants' plan fails to do so. Defendants, in turn, claim that they are exempt from this particular section of the Amendment, but even if it does apply to them, they argue that plaintiff does not serve a disproportionate number of low income people as defined by the Amendment.

An additional argument plaintiff raises is that the state's plan fails to comply with the requirement that the state "provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates." 42 C.F.R. 447.-253(c). In essence, plaintiff argues that the state's appeals procedure, which permits appeals for erroneous calculations based on the rates established, but not for appeals of the rates themselves, *see* 14 N.Y.C.R.R. § 577.9(a), is insufficient. Defendants suggest that New York's regulation regarding appeals is sufficient since the federal regulation upon which it was based gives discretion to the agency to determine those issues that can be appealed. 42 C.F.R. § 447.253(c).

Plaintiff's last two claims are based on the Constitution's equal protection and due process clauses. Plaintiff argues that while general hospitals with psychiatric

units are subject to the minimum utilization adjustments adopted by a different state agency, these hospitals are entitled to rate increases based on low volume, so-called "volume adjustments." Since plaintiff is not entitled to a similar adjustment, it raises an equal protection argument, claiming there is no rational reason behind a distinction between psychiatric hospitals and general hospitals with psychiatric units.[6] As to its due process argument, plaintiff contends that defendants are applying the minimum utilization adjustment in an effort to force the decertification of some of plaintiff's forty-one beds without affording it an opportunity to be heard. This, it is argued, amounts to a taking of property without due process.

Before turning to the instant summary judgment motions, we note that plaintiff moved for a preliminary injunction while the summary judgment motions were *sub judice*. Specifically, plaintiff seeks to prevent the state from using the minimum utilization adjustment while this action is pending. The need for such emergency relief is premised on the fact that the federal government recently informed plaintiff that it had been overpaid on reimbursements for Medicare in previous years and that the deficiency will be satisfied through deductions from any Medicare reimbursements to which plaintiff becomes entitled. This debit is entirely unrelated to the case at bar since it involves a completely different federal program, *i.e.*, Medicare as opposed to Medicaid. Nonetheless, plaintiff claims that it was not until the government notified it of the Medicare overpayments that the extent of the damage from the Medicaid reimbursement rates became fully apparent. As we pointed out to the parties at oral argument of the preliminary injunction application, since plaintiff would be required to establish, *inter alia*, a likelihood of success on the merits or at least serious questions going to the merits before a preliminary injunction could be granted, it would be extremely inefficient for us to decide that issue while the ulti-

---

**6.** As will be discussed, *see infra* note 9, new rate-setting procedures for psychiatric units of general hospitals have been proposed. This does

not change the argument raised by plaintiff with respect to past practices.

mate merits of the case are before us on the summary judgment motions. Thus, we will not address the motion for a preliminary injunction.

## II. DISCUSSION

The standard governing motions for summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be granted if the moving party can "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). If the moving party satisfies this burden, the party opposing the motion "must set forth specific facts showing that there is a genuine need for trial," Fed.R.Civ.P. 56(e), and there must be more than merely "some metaphysical doubt as to [these] material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).[7]

■■■ The principal issue raised by plaintiff is defendants' failure to conduct any type of formal study as required by the Boren Amendment. The Amendment specifically mandates that the state adopt a "plan through the use of rates ... which the State *finds* ... are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A) (emphasis added). Plaintiff contends that the requirement that the state make findings is particularly important since HHS does not review the adequacy of the state's findings, only the adequacy of its assurances. *See Wilder*, 110 S.Ct. at 2516. Thus, the mere fact that HHS approves a state's reimbursement methodology is not binding when a court is determining whether the state's rates satisfy the Amendment. "When a federal agen-

cy has erred as a matter of law, it is within our domain to say so." *Pinnacle Nursing Home*, 928 F.2d at 1314; *see also AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs.*, 879 F.2d 789, 796 (10th Cir.1989) ("court must determine whether the plan is procedurally and substantively in compliance with the requirements of the Federal Medicaid Act and its implementing regulations"), *cert. denied*, —— U.S. ——, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990).[8]

Defendants admit to not having conducted a formal study. Instead, in establishing the reimbursement rates, they relied on the successful use of minimum utilization adjustments by the state in other contexts. Specifically, defendants point to the New York State Department of Health's use of minimum utilization adjustments in rate-setting for general hospitals, including those with psychiatric units, since as early as 1976. *See* 10 N.Y.C.R.R. § 86–1.9. Thus, the state had experience with such rate adjustments and simply decided to extend them to private psychiatric hospitals. Defendants also suggest that the generally accepted view of experts in the field is that minimum utilization adjustments are an important means of forcing hospitals to increase efficiency and economy. Defendants specifically rely on a report from October 1976 by the National Academy of Sciences entitled "Controlling the Supply of Hospital Beds" (the "NAS Report"), which states, *inter alia*, that surplus beds contribute significantly to the rising costs of hospitalization. Furthermore, the report states that "[r]ecent studies have contained estimates that the cost of an empty bed is 50 percent of the cost of an occupied bed." NAS Report at 15. Finally, defendants argue that they sought feedback from the industry when the Adjustment was adopted

---

7. At oral argument of the summary judgment motions, it became clear to us that the parties were in agreement as to many of the purported factual disputes. Thus, we had them submit statements of contested and uncontested facts in an effort to afford the court a better opportunity to determine whether this litigation could be resolved at the summary judgment stage.

8. While not binding, the fact that the state and HHS approved OMH's reimbursement scheme is entitled to deference. *See Pinnacle Nursing Home*, 928 F.2d at 1313. Our inquiry must focus upon whether the action was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) (quoting 5 U.S.C. § 706(2)(A)).

and, in fact, five of the seven psychiatric hospitals subject to the Adjustment have not been affected adversely.

We admit that on its face, a minimum utilization adjustment appears to be a rational means of encouraging efficiency. A health care provider that consistently operates below capacity, yet maintains fixed costs associated with its actual capacity, should not be reimbursed for the fixed costs associated with these vacant beds. This is a particularly compelling argument when the state will only certify a fixed number of beds throughout the state. Therefore, a hospital that fails to maximize its capacity should have beds decertified so as to enable the state to allot more beds to hospitals experiencing no difficulties attracting patients. Unfortunately for the defendants, however, the mere fact that there may be strong policy reasons behind the adoption of such a reimbursement adjustment is insufficient. The Amendment has specific requirements that must be satisfied and post-hoc rationalizations simply do not suffice. *See West Virginia Univ. Hosps., Inc. v. Casey*, 885 F.2d 11, 30 (3d Cir.1989) ("[f]ederal law is not satisfied if a state merely makes conceptual policy decisions"), *cert. granted,* — U.S. ——, 110 S.Ct. 1294, 108 L.Ed.2d 472 (1990).

Notwithstanding the defendants' contentions as to why formal findings were unnecessary, the law of this circuit is unequivocal. In the recent decision of *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306 (2d Cir.1991), the court was presented with a challenge by a number of nursing homes to an amendment to the state's Medicaid reimbursement methodology for such facilities. Although the state had conducted findings and given assurances to HHS, the court considered them inadequate. In so holding, the court rejected the state's contention that requiring further findings was an " 'additional and rigid procedural requirement[ ]' not mandated by the [Boren Amendment]." *Id.* at 1313 (quoting Defendants' Brief). Specifically, the court stated that while a state need not submit findings to HHS, only assurances that the requisite statutes and regulations

have been complied with, before making such assurances "the state *must* engage in a findings process." *Id.* at 1313 (citing *AMISUB(PSL),* 879 F.2d at 796); *see also Wilder,* 110 S.Ct. at 2519 n. 11 ("[t]he requirement that a State make such a finding is a necessary prerequisite to the subsequent requirement that the State provide 'assurances' to the Secretary"). The court appeared particularly influenced by the mandatory rather than precatory language of the Amendment, which requires that the state " '*must*' provide for payment of rates which the state *finds* are reasonable and adequate." *Pinnacle Nursing Home,* 928 F.2d at 1314 (quoting 42 U.S.C. § 1396a(a)(13)(A)); *see also Wilder,* 110 S.Ct. at 2518 (recognizing that "Boren Amendment is cast in mandatory rather than precatory terms"). After stating that findings were mandated by the Amendment, the court reviewed the findings and assurances at issue. Since neither was sufficient, the court concluded that the procedural requirements of the Amendment had been violated and the provisions at issue were declared null and void. *Pinnacle Nursing Home,* 928 F.2d at 1316. The court remanded the case to district court for resolution of the substantive and constitutional claims asserted by the nursing homes, "if and when the state submit[ted] proper findings as required by the Boren Amendment." *Id.* at 1318.

Thus, the requirement that findings be made before the state amends its reimbursement methodology is clear. Defendants' admission that they did not make such findings is, therefore, fatal and the Adjustment must be deemed null and void. Moreover, a brief analysis of the reasons offered by the defendants for not conducting any formal findings makes it readily apparent why the requirement is mandatory.

The state initially relies on the Department of Health's use of minimum utilization factors in general hospitals since 1976. While it is true that the general hospitals, including those with psychiatric units, have utilized such factors since 1976, the state has also permitted volume adjustments for those hospitals experiencing below average

lengths of stay. *See* 10 N.Y.C.R.R. § 86–1.12. While we need not get into the specifics of such volume adjustments, they diminish the hardships imposed by minimum utilization adjustments by artificially increasing a hospital's actual occupancy rate. As the state admits, one of the rationales behind volume adjustments is to "ameliorate the adverse effects of shorter lengths of stay, and reductions in the number of admissions, by recognizing that fixed costs cannot be adjusted immediately to account for changes in volume." Defendants' Statement Concerning Non–Stipulated Facts & Proofs ¶ 16. Also, volume adjustments prevent hospitals from unnecessarily extending patients' periods of hospitalization in order to meet minimum utilization guidelines. While the defendants contend that it is inapposite to compare the reimbursement rates for general hospitals with the psychiatric hospitals at issue because they are controlled by different state agencies, *i.e.* the Department of Health and the Office of Mental Health, this misses the crucial issue before us at present. The state does not apply a straight minimum utilization adjustment in general hospitals. Thus, its reliance on the use of minimum utilization adjustments in general hospitals as a basis for utilizing such adjustments in psychiatric hospitals is simply misplaced. Perhaps, plaintiff argues, it should be entitled to volume adjustments because episodically ill mental patients do not have long periods of hospitalization. This is precisely the reason why findings by the state are necessary.[9]

The second factor relied on by defendants in arguing that formal findings were unnecessary is the fact that minimum utilization adjustments are allegedly an accepted means of increasing efficiency. The specific report they rely on, however, belies this argument. The NAS Report, *see supra* page 86, focuses upon short-term general hospitals, *see* NAS Report at 1, and at least one of the studies conducted excludes data involving mental hospitals. *Id.* at 8 n. 1. The report further states that the goal of reducing beds "should be applied flexibly ... paying particular attention to the differences between medical-surgical beds and obstetrical, pediatric, and other specialized care beds." *Id.* at ix. A separate study cited by plaintiff claims that "partial debedding programs, programs to induce or require hospitals to remove beds from service, are unlikely to produce significant cost savings, particularly if those reductions occur primarily in small or medium-sized hospitals." M.V. Pauly & P. Wilson, *Hospital Output Forecasts and the Cost of Empty Hospital Beds*, 21 Health Services Research 403, 424 (August 1986). Thus, in a small hospital like plaintiff's, which has only forty-one beds, there may not be significant costs associated with eleven (approximately twenty-five percent) vacant beds. In a hospital with one thousand beds, however, a twenty-five percent vacancy rate means that two hundred fifty beds are vacant. Such a large number of vacant beds obviously has greater costs associated with them than would eleven vacant beds. Just the space that would be required to house those additional two hundred fifty beds would be extremely expensive.[10]

Another study plaintiff points to suggests that we should only look to the hospital beds that are actually set for patients. *See* Letter of June 21, 1984 from R. Man-

---

9. As we previously suggested, *see supra* note 6, rate-setting methodologies for the psychiatric units of general hospitals are being amended. These changes may ultimately be applied to private psychiatric hospitals as well. An important modification involves the elimination of volume adjustments. Again, we need not discuss the change, but only mention it to show how, once again, the state has treated general hospitals differently than psychiatric hospitals. While the state certainly has the right to do so, the disparate treatment afforded the different types of hospitals is further support for plaintiff's contention that the state cannot simply rely on its use of minimum utilization adjustments in general hospitals as a means of avoiding the specific statutory requirement of conducting findings.

10. Defendants suggest that the Pauly and Wilson article is not relevant to the type of reimbursement methodology adopted by the state in the instant case. This may be true, but it is something that can be explored by the state in conducting its findings in accordance with federal statutes and regulations.

derscheid, Chief, Survey & Reports Branch, Nat'l Inst. of Mental Health, to J. Schoenholtz, Chairman, New York State Ass'n of Private Psychiatric Hosps. In the case at bar, plaintiff has twenty-seven beds in its main building and another fourteen beds in a cottage. Since plaintiff was operating at about fifty percent capacity, only the main building was being utilized. This is an important factor since costs related to the forty-one beds vary depending upon whether the beds are being utilized or not and, if not, whether the empty beds are in the main building or the cottage. For example, if the cottage remains vacant it might not require heat or extensive maintenance, but a vacant bed in the main building still has these costs to consider. Thus, an argument can be made that rather than determining reimbursement rates based on seventy-five percent of forty-one, the proper equation would calculate seventy-five percent of twenty-seven. Again, we need not resolve this issue, but it is certainly something the state can consider in conducting its findings.

Finally, there are a number of other questions raised by the rates defendants have set. For example, it is unclear why seventy-five percent was selected as the cutoff, rather than eighty or seventy percent. Moreover, it is unclear why the state looks to a period of time two years before the rate year to determine if the seventy-five percent occupancy has been satisfied. Why not one or three years? By these questions, we do not suggest that the rates as presently established do not comport with federal law. That is an issue for another day, after the state has made the necessary findings. It would be illogical for federal courts to engage in factfinding missions while the state agencies with expertise in the particular field sit on the sidelines.[11]

11. With respect to the findings the state must conduct, we see nothing to prevent the state from looking to its experience with the Adjustment with private psychiatric hospitals from 1984 until the present date. For example, plaintiff argues that the Adjustment encourages hospitals to increase patients' periods of hospitalization, while the defendants contend that nothing of the sort has occurred. The state can certainly consider this issue in making its findings. Moreover, we note that for general hospitals, state law spells out specific factors to be considered by the Department of Health in adopting rates that are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." N.Y.Pub.Health Law § 2807(3) (McKinney 1991).

### III. CONCLUSION

For all the foregoing reasons, we declare New York's minimum utilization adjustment as codified at 14 N.Y.C.R.R. § 577.-7(g) to be null and void. The remaining challenges made by plaintiff need not be addressed until the state cures this procedural violation of the Boren Amendment. *See Pinnacle Nursing Home*, 928 F.2d at 1318.

SO ORDERED.