PINNACLE NURSING HOME; Lakeshore Nursing Home; Fenton Park Nursing Home; Sylcox Nursing Home and Health Related Facility; Nortonian Nursing Home; Elcor Nursing Home; Elcor's Marriott Manor; Waterview Hills Nursing Center, Inc.; Walnut Mountain Care Center; Ridge View Manor Nursing Home; Manor Oak Skilled Nursing Facility, Buffalo, Manor Oak Skilled Nursing Facility, Jamestown; Manor Oak Skilled Nursing Facility, Warsaw; Fenton Park Health Related Facility, d/b/a Greenhurst Health Care Center; Oneonta–Richmond, Inc. d/b/a Oneonta Nursing Home; Vestal–Johnson, Inc. d/b/a Vestal Johnson Nursing Home; Crest Manor Nursing Home; Doanes Nursing Home; Blossom Health Care Center;

Pontiac Nursing Home; Brae Loch Manor Health Care Facility; Nor Loch Manor Health Care Facility; Grand Island Manor Nursing Home; Hornell Nursing Home and Health Related Facility; Hurlbut Nursing Homes; Penfield Nursing Home; Conesus Lake Nursing Home; Elm Manor Nursing Home; Wedgewood Nursing Home; Westgate Nursing Home; Woodside Manor Nursing Home, Inc.; Newark Manor Nursing Home; and Avon Nursing Home, Plaintiffs,

v.

David AXELROD, M.D., as Commissioner of Health of the State of New York; Cesar Perales, as Commissioner of Social Services of the State of New York; Dall Forsythe as Director of the Budget of the State of New York, and Louis Sullivan, as Secretary of the United States Department of Health and Human Services, Defendants.

VALLEY VIEW MANOR NURSING HOME, Plaintiff,

v.

David AXELROD, M.D., as Commissioner of Health of the State of New York; Cesar Perales, as Commissioner of Social Services of the State of New York; Dall Forsythe as Director of the Budget of the State of New York, and Louis Sullivan, as Secretary of the United States Department of Health and Human Services, Defendants.

Nos. CIV–89–0706T, CIV–89–0744T.

United States District Court, W.D. New York.

Aug. 15, 1989.

Harter, Secrest & Emery (C. Richard Cole, of counsel), Rochester, N.Y., for plaintiffs.

Atty. Gen. of the State of N.Y. (Jeffrey M. Dvorin, Asst. Atty. Gen., of counsel), Dept. of Law, Albany, N.Y., for Axelrod, Perales and Forsythe.

U.S. Attorney's Office (Brian McCarthy, Asst. U.S. Atty., of counsel), Rochester, N.Y., for Sullivan.

## DECISION AND ORDER

TELESCA, Chief Judge.

## I. INTRODUCTION

The plaintiffs in these nearly identical actions are residential health care facilities caring for elderly and infirmed patients in 16 different counties throughout New York State.[1] The defendants[2] are state and federal òfficials who are charged with the administration and/or review of New York State's Medicaid program, a program jointly supported with federal and state funds, which reimburses facilities such as plaintiffs' for their provision of necessary medical services to the indigent.

Plaintiffs commenced these actions in June, 1989, for declaratory and injunctive relief, alleging that the current method under which they are reimbursed by Medicaid is both invalid under federal law and violative of their constitutional right to equal protection under the law. Jurisdiction arises under 28 U.S.C. § 1331.

Plaintiffs have also moved for preliminary injunctions to enjoin the state from reimbursing them pursuant to the challenged reimbursement rates and further to require the state to reimburse plaintiffs in accordance with a former rate methodology. Plaintiffs in *Pinnacle* have also moved, in the alternative, for summary judgment. Louis Sullivan, the federal defendant, has also moved for summary judgment.

For the reasons discussed below, and in accordance with this decision, plaintiffs' motions for preliminary injunction are granted and their motion for summary judgment is partially granted and partially denied, with leave to renew upon completion of discovery. Defendant Sullivan's motions for summary judgment are denied.

## II. FINDINGS

Plaintiffs are residential health care facilities within the meaning of N.Y. Public Health Law § 2801(3). Each plaintiff provides nursing home and/or other health-related services to elderly or infirmed patients who are indigent, under the Medicaid program established by Congress pursuant to Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*

### A. *Medicaid*

The Medicaid program establishes a joint federal and state cost-sharing system to provide necessary medical services to individuals with limited resources. As part of the Medicaid program, the federal government reimburses participating states for a percentage of the payments each state makes to facilities for medical services furnished to the impoverished. Participation in the Medicaid program is voluntary. Once a state elects to participate in Medicaid, however, it must comply with relevant federal statutory requirements.

Since the inception of the Medicaid program in 1966, the method for reimbursing facilities such as plaintiffs' has undergone significant change. Prior to 1981, the federal Medicaid statute required reimbursement of the "reasonable cost" of in-patient services rendered to Medicaid patients. This retrospective method reimbursed participating facilities based upon their actual, allowable costs. This "reasonable cost" standard was, however, specifically re-

1. While no formal motion to join these cases has been made, Valley View Manor has orally requested that the cases be considered together, and defendants have submitted identical papers in opposition to the motions in these cases. I have considered the cases jointly for purposes of these motions, in accordance with Fed.R. Civ.P. 42(a).

2. The complaint alleges venue in the Western District pursuant to 28 U.S.C. § 1391(b), to which no defendant has objected.

pealed by Congress in 1980. *See* Omnibus Budget Reconciliation Act of 1980 (OBRA of 1980), Pub.L. 96–499, § 962(b), 1980–5 U.S.Code Cong. & Admin. News 5744 and Omnibus Budget Reconciliation Act of 1981 (OBRA of 1981), Pub.L. 97–35, 1981–1 U.S. Code Cong. & Admin. News (95 Stat.) 809 (the "Boren Amendment").

The purposes of the Boren Amendment are twofold: (i) to enable individual states to develop various Medicaid plans and (ii) to increase the economy and efficiency of all such plans. The Boren Amendment amended the Medicaid Act to provide that each participating state must make findings and provide assurances satisfactory to the Secretary of the United States Department of Health and Human Services that the Medicaid rates set by the state provide:

> for payment ... reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access ... to ... services of adequate quality;

42 U.S.C. § 1396a(a)(13)(A).

In enacting the Boren Amendment, Congress essentially abandoned the "reasonable cost" reimbursement principles of the old Medicaid Act as inflationary and, in its place, adopted a new, anti-inflationary reimbursement standard with the stated purpose of "promot[ing] the efficient and economical delivery of [medical] services." See S.Rep. No. 139, 97th Cong., 1st Sess. 478 (1981), *reported in* 1981 U.S.Code Cong. & Admin. News at 396, 744.

### B. *New York's Medicaid Plan*

Having elected to participate in the Medicaid program, New York was obligated to adopt a Medicaid reimbursement system comporting with both the Boren Amendment and the regulations promulgated thereunder. *See* 42 C.F.R. § 447.1 et seq. (1988).

Under the provisions of Article 28 of the New York Public Health Law, the New York State Department of Health is charged with the responsibility for setting Medicaid reimbursement rates for residential health care facilities such as plaintiffs'. The methodology for computing reimbursement rates is set forth in N.Y. Comp.Codes R. & Regs. tit. 10, § 86–2. Since 1986, in response to the Boren Amendment, New York has set its Medicaid reimbursement prospectively, based upon historic 1983 costs incurred by facilities throughout the state and adjusted for inflation.[3]

### C. *RIPAF*

As part of the 1986 Medicaid plan, the New York State Commissioner of Health introduced the Regional Input Price Adjustment Factor ("RIPAF") in order to "neutralize the difference in wage and fringe benefit costs between and among the regions [of New York State]." N.Y.Comp. Codes R. & Regs. tit. 10, § 86–2.10(c)(3)(i). Under RIPAF, the average wage rate for facilities within each of the State's 16 regions was calculated for the base year of 1983, and every facility reimbursed based upon the "average wage rate" within its region. Plaintiffs provide the following example of the effect of RIPAF on reimbursement:

> [E]ach facility within the Rochester region received wage reimbursement in 1986 based upon the 1983 Rochester region's $7.00 per hour average wage rate, rather than at each facility's actual 1983 wage rate. Thus, two Rochester region homes with actual 1983 wage rate costs of $9.00 per hour and $5.00 per hour would both have received 1986 reimbursement based upon the $7.00 regional average rate, trended forward by an inflation index.

(*Pinnacle* plaintiffs' Memorandum of Law at 8.)

---

**3.** The highest percentage of a nursing home's operating costs is its employee wage and fringe benefit expenses. The State's own statistics indicate that such wages and benefits comprise more than 70% of most homes' total operating costs.

The parties agree that this 1986 RIPAF methodology was fully approved by the Health Care Financing Administration ("HCFA") (the agency charged by the U.S. Department of Health and Human Services with reviewing Medicaid plans).

### D. *The 1987 Adjustment to RIPAF*

In October 1986, just ten months after New York's 1986 Medicaid reimbursement methodology had taken effect, the New York Department of Health advised residential health care facilities within New York that "emergency" conditions required an alteration to that methodology. Effective January 1, 1987, the Department proposed to implement the "1987 Adjustment to RIPAF." The 1987 Adjustment to RIPAF purported to create "an average state-wide positive or negative 10% corridor" around the already-established regional average wage rates. This Adjustment effectively provides that all homes whose actual 1983 costs fall within the specified "corridor"[4] would no longer be reimbursed based on the regional average wage rate, but rather upon each facility's *actual* reported 1983 wage rate.[5]

The New York State Department of Health attempted to justify the 1987 Adjustment to RIPAF by stating that the 1986 RIPAF methodology had "created a situation wherein facilities within the region with the highest dollar per hour were adversely affected, while facilities with the lowest dollar per hour were aided."

In this litigation the State subsequently refined that justification, stating that the 1987 Adjustment was implemented to aid "publicly owned facilities whose higher labor costs resulted from historical factors beyond their control (e.g., mandated fringe benefits such as pension contributions)." The State does not dispute, however, that the 1987 Adjustment also benefits any oth-

er high-cost residential nursing home facility, regardless of the cause of its respective high costs, at the expense of lower-cost facilities, such as plaintiffs'.

While the New York Department of Health informed residential health care facilities in October 1986 of its intention to implement the 1987 Adjustment to RIPAF, no such plan was submitted to the Federal Government until April 1, 1987. At that time, the State represented to HCFA that the 1987 Adjustment to RIPAF was not a "significant change" in Medicaid payment methods or standards, and therefore did not constitute an amendment to the State Medicaid plan which requires prior notice to and approval of HCFA. *See* 42 C.F.R. § 447.253 (1987). The State maintains, now as then, that the 1987 Adjustment is not a "significant change" because it is budget-neutral—that is, it affects merely the allocation, and not the amount, of Medicaid funds.

HCFA reviewed the New York submissions and, on May 28, 1987, formally advised the State that additional information was required before HCFA could consider approving the application. HCFA *expressly* challenged New York's assertion that the 1987 Adjustment to RIPAF did not constitute a "significant change" in New York's method of Medicaid reimbursement.

New York, however, failed to comply with HCFA's formal request until November, 1988, when compelled to do so by court order in a related State court action.[6] This order issued 22 months after the proposed effective date of the 1987 Adjustment.

After reviewing New York's "final" response submitted in November, 1988, HCFA *again* advised the State that the 1987 Adjustment constituted a "significant change" for which New York State was required by Federal regulations to provide

---

**4.** Plaintiffs in these actions are facilities whose costs fall within the "corridors" of their respective regions.

**5.** In determining the real impact of a reimbursement methodology *based on* actual historical costs, a crucial fact is that Medicaid reimbursement does not provide for *all* actual costs, but rather, a portion thereof. Proprietary nursing

homes must charge their self-pay, i.e., non-Medicaid, patients higher rates in order to cover the unreimbursed costs of caring for Medicaid residents.

**6.** Order of Hon. Richard C. Wesley, Justice of the Supreme Court of the State of New York, issued October 28, 1988.

adequate assurances and related information. HCFA further advised New York that, given the State's deficient submissions, HCFA was initiating disapproval of the proposed plan amendment.

Finally, on February 7, 1989, more than two years after the initial effective date of the 1987 Adjustment, New York submitted to HCFA a letter stating that assurances which had been submitted to HCFA in March 1987 in support of an unrelated change in New York's Medicaid plan also constituted assurances in support of the 1987 Adjustment.

On February 21, 1989, in a terse two-paragraph letter, HCFA approved the 1987 Adjustment, effective retroactively to January 1, 1987. The letter references neither HCFA's earlier objections to the Adjustment nor the State's response thereto, other than to thank the State for its cooperation.

With care, and with the deference due to the rightful actions of State and Federal administrative agencies, I have reviewed the correspondence between the State and HCFA concerning the 1987 Adjustment, particularly the specific concerns repeatedly raised by HCFA over the impact of the 1987 Adjustment on residential health care facilities and the assurances (originally submitted by the State to HCFA in support of "State Plan Submittal 87–6," a totally unrelated change in New York's Medicaid Plan). The State's assurances are best evaluated in a direct comparison with the Federal regulation which mandates their submission.

E. *Comparison of the Federal Regulation and the State's Assurances*

The Applicable Regulation

42 C.F.R. § 447.253 Other Requirements

(a) State Assurances. In order to receive HCFA approval of a State plan change in payment methods and standards, the Medicaid agency must make assurances satisfactory to HCFA that the requirements set forth in ¶¶ (b) through (g) of this section are being met, must submit the related information required by § 447.255 of this subpart, and must comply with all other requirements of this subpart.

(b) Findings. Whenever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make the following findings:

(1) Payment Rates. (i) The Medicaid agency pays for in-patient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

The Assurances Submitted

State Assurances Required by 42 C.F.R., Part 447, Subpart C, with respect to the 1987 Medicaid rates and rate methodology.

1. The State of New York pays for long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards. These rates are determined in accordance with the methods and standards set forth in subpart 86–2 of Part 86 of Title 10 (Health) of the Official Compilation of Codes, Rules, and Regulations of the State of New York. (10 NYCRR).

. . .

(C) that payment rates are adequate to assure that recipients have reasonable access taking into account geographic location and reasonable travel time, to in-patient hospital services of adequate quality.

(2) Upper payment limits. The agency's proposed payment rate will not exceed the upper payment limits as specified in § 447.272.

(c) Provider Appeals. The Medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.

(d) Uniform Cost Reporting. The Medicaid agency must provide for the filing of uniform cost reports by each participating provider.

(e) Audit Requirements. The Medicaid agency must provide for periodic audits of the financial and statistical records of participating providers.

(f) Public Notice. The Medicaid agency must provide that it has complied with the public notice requirement in § 447.205 of this part when it is proposing significant changes to its methods or standards for setting payment rates for in-patient hospital or LTC facility services.

(g) Rates Paid. The Medicaid agency must pay for in-patient hospital and long term care services using rates determined in accordance with methods and standards specified in an approved State plan.

2. The estimated average proposed payment rates for long-term care facility services are reasonably expected to pay no more in the aggregate for long-term care facility services than the amount the Department reasonably estimates would be paid for the services under the Medicare principles of reimbursement.

3. State of New York provides an appeal procedure that allows individual providers to submit additional evidence and receive prompt administrative review, with respect to such issues as the Department of Health determines appropriate. This requirement is met through the provisions of 10 NYCRR 86-2.13 and 86-2.14.

4. The State of New York provides for the filing of uniform cost reports by each participating provider. With respect to long-term care facilities, this requirement is met through the provisions of 10 NYCRR 86-2.2, 86-2.3, 86-2.4, 86-2.5, and 86-2.6.

5. The State of New York provides for periodic audits of the financial and statistical records of participating providers. This requirement is met through the provisions of § 86-2.7 of 10 NYCRR and 18 NYCRR Parts 517 and 518.

6. In making significant changes in its methods and standards for determining payment rates for 1987, the State of New York has complied with the public notice requirements set forth in 42 C.F.R. § 447.205. Notice of the proposed change in the State's methods and standards for setting 1987 payment rates for long-term care facility services regarding recalibration of the 1987 residential health care facility rates was published in the New York State Register (Volume III, Issue 35) on September 3, 1986.

7. The State of New York pays for long-term care services using rates determined in accordance with methods and standards specified in an approved State plan.

---

I find that no reasonable person could consider that these "assurances" even address, let alone answer, either the general requirements of the federal regulation or the specific concerns raised by HCFA. The assurances are patently and painfully in-

sufficient, constituting nothing more than a formalistic recitation of the federally mandated requirements of a Medicaid Plan.

## III. CONCLUSIONS

### A. *Standard For Injunctive Relief*

A party who seeks a preliminary injunction must establish (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of its claim to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in its favor. *See, e.g., Sperry International Trade, Inc. v. Government of Israel,* 670 F.2d 8, 11 (2d Cir.1982); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) *(per curiam ).*[7]

### B. *Irreparable Harm*

■ The *sine qua non* of such preliminary relief is, of course, satisfactory proof of the threat of irreparable harm. In support of their claims of the harm with which they are threatened by continued Medicaid reimbursement pursuant to the 1987 Adjustment, the plaintiffs provide the affidavits of both the owners and the administrators of the individual facilities, as well as the affidavit of *Pinnacle* plaintiffs' attorney, who narrates the saga of plaintiffs' attempts to wrest from the State available documentation concerning the implementation of the 1987 Adjustment (eventually successful) and to appeal the inadequate reimbursement actually paid out pursuant to the Adjustment in 1987 and in 1988 (these State court actions are currently stayed).

The gist of the affidavits of owners and administrators is that plaintiffs cannot profitably carry on their businesses when they are reimbursed pursuant to the 1987 Adjustment. In opposition to these affidavits, the State has submitted evidence that many of the plaintiffs made a "substantial profit," ranging from $12,000 to $735,000, in 1988. The State does not, however, dispute plaintiffs' claims of losses incurred in 1987 and of projected losses for 1989. Moreover, the State in no way responds to plaintiffs' claim that any such profits are the result of extraordinary measures undertaken by the plaintiffs, including severe staff reductions, postponement of needed capital improvements, and the infusion of capital by the facilities' owners/stockholders. It is beyond dispute that plaintiffs cannot have indefinite recourse to such severe measures in order to compensate for an increasing shortfall in their Medicaid reimbursement.

The State further claims that any harm occasioned to plaintiffs by the 1987 Adjustment is compensable in money damages, and is therefore not the proper subject of injunctive relief. If the destruction of their businesses is imminent, the State suggests, plaintiffs should state the dates on which they intend to file their petitions in bankruptcy.

Certainly, the *compensable* loss of money, standing alone, does not warrant injunctive relief. This case, however, concerns much more than profits lost. Plaintiffs have been reimbursed for over two years under the 1987 Adjustment. Under the 1987 Adjustment, plaintiffs have had to reduce their staffs, increase the charge for

---

**7.** The Second Circuit has held, however, that,

[W]here the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme, the District Court should not apply the less rigorous fair-ground-for-litigation standard and should not grant the injunction unless the moving party establishes, along with irreparable injury, a likelihood that he will succeed on the merits of his claim. *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 580–81 (2d Cir.1989) (citations omitted). In this case, it is not at all clear that the State has both acted in pursuit of the public interest and in accordance with a proper regulatory scheme, thus

triggering a more rigorous standard for the granting of this preliminary injunction. *Cf. Medical Society of the State of New York v. Toia,* 560 F.2d 535, 538 (2d Cir.1977); *Plaza Health,* 878 F.2d at 580–81. No further exploration of this issue is necessary, however, because, as discussed more fully below, I find, as a matter of law, that the 1987 Adjustment to RIPAF was adopted in violation of applicable Federal law and regulations and is, accordingly, null and void. Insofar as plaintiffs seek a declaration to that effect, they have prevailed on the merits of their respective cases, thus satisfying the second requirement for the grant of preliminary relief.

services to non-Medicaid patients, and severely curtail capital improvement projects. In effect, the 1987 Adjustment has become the dominant factor in the administration of these facilities. Money damages alone cannot compensate for its deleterious effects on plaintiffs' staffs and physical plants which, in turn, inevitably impact upon the patients, who are the intended beneficiaries of both these facilities and the entire Medicaid program. To require plaintiffs to delay these motions until bankruptcy is imminent would render their preliminary relief from harm a Pyrrhic victory. Such harm affronts justice; when it is effected—as I find the 1987 Adjustment was effected—in violation of Federal laws and regulations, it warrants injunction.

### C. Success On The Merits

In these actions, plaintiffs seek (i) a declaration that defendants' actions are in contravention of both the Social Security Act and the Equal Protection Clause of the United States Constitution and (ii) an injunction preventing the defendants from applying the 1987 Adjustment to RIPAF in the formulation of plaintiffs' Medicaid reimbursement rates.

Plaintiffs argue that the 1987 Adjustment is both procedurally and substantively defective. They assert that it is procedurally defective because it was adopted without submission of appropriate findings and assurances as required by 42 U.S.C. § 1396a(a)(13)(A) and the regulations promulgated thereunder, 42 C.F.R. Ch. IV, subpart C. The 1987 Adjustment is substantively defective, plaintiffs assert, because it effectively favors high-cost (i.e., uneconomical and unefficient) facilities over low-cost (i.e., economical and efficient) facilities, in violation of both the Social Security Act as amended by the Boren Amendment and the Equal Protection Clause of the United States Constitution.

▋ The Court acknowledges that a Medicaid reimbursement plan results from legislative and policy decisions made at both the Federal and State levels and that judicial review is both limited and "highly deferential," presuming agency action to be valid, and refraining from substituting the Court's own judgment for that of the agencies. See *Colorado Health Care Association v. Colorado Department of Social Services*, 842 F.2d 1158, 1164 (10th Cir.1988); *California Hospital Association v. Schweiker*, 559 F.Supp. 110, 116 (C.D.Cal.1982), *aff'd*, 705 F.2d 466 (9th Cir. 1983). In reviewing non-adjudicatory Federal agency action, the Court is limited to deciding whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accord with law." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). In addition, since Federal law gives each state great latitude in dispensing its available funds, the same standard of review afforded the action of a Federal agency applies as well to actions of a state agency in administering a Medicaid plan. *Friedman v. Perales*, 668 F.Supp. 216, 221 (S.D.N.Y.1987), *aff'd*, 841 F.2d 47 (2d Cir. 1988).

Viewing the record in this case under that standard, I cannot now find as a matter of law that the substance of the 1987 Adjustment violates either the Social Security Act or the plaintiffs' constitutional right to equal protection.[8] Whether the 1987 Adjustment functions so as to violate the federally mandated standards for Medicaid plans of economy and efficiency must be determined after discovery, if not at trial.[9]

---

**8.** Were this the only issue presented by plaintiffs, and thus discussion of their likelihood on the merits a prerequisite for the granting of this preliminary injunction, the record would indeed support a finding that plaintiffs are more likely than not to prevail in their claim that reimbursement under the 1987 Adjustment is neither reasonable nor adequate. See *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir.1985) (Probability of prevailing need only be "better than fifty percent.") Because I do not decide this issue at this time, I must deny defendant Sullivan's motions for summary judgment.

**9.** Such discovery must include, as the State points out, the impact of currently pending State regulations which would affect Medicaid reimbursement based on costs incurred in hiring and retaining nurses.

I am not, however, similarly constrained from deciding whether the 1987 Adjustment is procedurally defective.

■ The Social Security Act requires states to use Medicaid reimbursement rates which the state *finds*, and *makes assurances* satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ...

42 U.S.C. § 1396a(a)(13)(A).

Federal regulations promulgated under the Social Security Act provide, in part that

in order to receive HCFA approval of a state plan change in payment methods and standards, the Medicaid agency must make assurances satisfactory to HCFA that the requirements set forth in ¶ (b) through (g) of this section are being met, must submit the related information required by § 447.255 of this subpart, and must comply with all other requirements of this subpart.

This decision has already set out the assurances submitted by the State in support of the 1987 Adjustment, and has declared them utterly insufficient to justify approval of the plan amendment.[10]

Since the 1987 Adjustment to RIPAF was adopted by the State and submitted to HCFA without the findings and assurances mandated by Federal law, HCFA's approval of the Adjustment is in violation of the Social Security Act and totally without legal effect. *See Nebraska Health Care Association, Inc. v. Dunning*, 778 F.2d 1291,

1294 (8th Cir.1985); *see also, AMISUB (PSL), Inc. v. Colorado*, 879 F.2d 789 (10th Cir.1989).

Insofar as Pinnacle plaintiffs' motion for summary judgment seeks a declaration that the 1987 Adjustment was adopted in violation of federally mandated procedure and is accordingly null and void, that motion is granted. This determination, together with my earlier finding of irreparable harm, also entitles plaintiffs to the preliminary injunctions they seek.

D. *Relief To Be Granted*

■ The same concerns for judicial restraint which lead me to refuse to address the substantive merits of the 1987 Adjustment also motivate the scope of the preliminary relief to be granted. Under most circumstances, those concerns would prompt me to enjoin only the use of the 1987 Adjustment pending the State's submission to HCFA of adequate findings and assurances concerning the Adjustment. In this case, however, I realize that such a limited order would effectively provide neither incentive to the defendants nor relief to the plaintiffs.

In this case, this realization does not require me to assume the role of policy maker, to which I am neither entitled nor inclined. In the absence of a properly adopted 1987 Adjustment, I find it appropriate to order the State to reimburse plaintiffs in accordance with the 1986 RIPAF, as already adopted in a Medicaid plan

---

**10.** Had these assurances been adequate, a question would have arisen whether their submission in early 1987 in support of a totally unrelated plan amendment justified the retroactive approval of the 1987 Adjustment in early 1989. Federal regulations do provide guidelines for the timeliness of state plan amendments:

*Effective date.* A state plan amendment that is approved will become effective not earlier than the first day of the calendar quarter in which an *approvable* amendment is submitted in accordance with § 430.20 of this chapter and 447.253.

42 C.F.R. § 447.256(c) (emphasis added).

In relevant part, 42 C.F.R. § 430.20 also concerns the effective date of a plan and provides at (b)(2), "the effective date may be a date requested by the state if HCFA approves it." Focusing

on that regulation alone could justify defendants' current argument that approval of the 1987 Adjustment, granted in early 1989 retroactively to January 1, 1987, was pursuant to a prior agreement between the State and HCFA. Such an interpretation of § 430.20, however, would do violence to the plain language of § 447.256(c), which provides that a state plan amendment may become effective the first day of a calendar quarter in which an *approvable* amendment is submitted "in accordance with § 430.20 of this chapter *and* 447.253." Since, even to this date, no satisfactory assurances have been submitted to HCFA concerning the 1987 Adjustment, no "approvable amendment" concerning the Adjustment has yet been submitted and accordingly, the Adjustment has no effective date.

amendment which has been approved by HCFA.

WHEREFORE, the motion of the *Pinnacle* plaintiffs for summary judgment is granted insofar as it seeks a declaration that the 1987 Adjustment was adopted without complying with federally mandated procedure and is accordingly null and void; the motions of plaintiffs for a preliminary injunction are granted, and defendants are hereby enjoined from employing the 1987 Adjustment in calculating Medicaid reimbursement for plaintiffs and are further hereby ordered to employ the 1986 RIPAF in calculating such reimbursement;[11] in all other respects, *Pinnacle* plaintiffs' motion for summary judgment and defendant Sullivan's motions for summary judgment are denied with leave to renew upon completion of discovery.

ALL OF THE ABOVE IS SO ORDERED.

11. Subject, however, to compliance with the requirements of Fed.R.Civ.P. 65(c).