**ERIE COUNTY GERIATRIC CENTER, a Pennsylvania non-profit corporation; County of Erie; J. Robert Baldwin, individually and on behalf of all other similarly situated real estate taxpayers of Erie County, Pennsylvania, Appellants,**

v.

**Louis W. SULLIVAN, M.D., Secretary of U.S. Department of Health and Human Services; and Walter W. Cohen, Secretary of the Commonwealth of Pennsylvania, Department of Public Welfare.**

No. 91–3218.

United States Court of Appeals, Third Circuit.

Argued Oct. 1, 1991.

Decided Dec. 26, 1991.

---

James K. McNamara (argued), Kenneth W. Wargo, Quinn, Gent, Buseck and Leemhuis, Inc., Erie, Pa., for appellants.

Eileen Bradley, Chief Counsel, James C. Newman, Supervisory Asst. Regional Counsel, Javier A. Arrastia, Asst. Regional Counsel (argued), Office of Gen. Counsel, Dept. of Health and Human Services, Philadelphia, Pa., Thomas W. Corbett, Jr., U.S. Atty., Pamela J. Grimm, Asst. U.S. Atty., W.D.Pa., Pittsburgh, Pa., for appellees.

Before SLOVITER, Chief Judge, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal raises issues emanating from the ongoing struggle of the Federal Government and the Commonwealth of Pennsylvania to contain costs in the delivery of health care services under the cooperative federal-state Medicaid program, Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 *et seq.* (1983 and West Supp.1991). Plaintiff-appellants, the Erie County Geriatric Center (ECGC or the Center), a non-profit corporation providing long-term health care to aged indigent under Medicaid, and the County of Erie, a guarantor of all of the Center's indebtedness, challenged the validity of the approval by the Secretary of the United States Department of Health and Human Services (the Secretary or HHS) of the 1980 and 1982 amendments to the Pennsylvania medical assistance plan.

■ As a participant in the Medicaid program, Pennsylvania must comply with the federal statutory and regulatory scheme which requires, *inter alia,* that it establish a medical assistance program designed to pay skilled nursing facilities (SNFs) and intermediate care facilities (ICFs) rates "which are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities [providing] care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards." 42 U.S.C. § 1396a(a)(13)(A). Plaintiffs filed a complaint against the Secretary and the Pennsylvania Department of Public Welfare (DPW) in 1984 seeking declaratory relief in the United States Dis-

trict Court for the Western District of Pennsylvania on the ground that the Secretary's approval and the State's application of the 1980 and 1982 plan amendments violated the Medicaid law. The district court dismissed the claims against DPW on eleventh amendment sovereign immunity grounds under *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), and DPW is not a party to this appeal.[1]

The plaintiffs and the Secretary filed cross-motions for summary judgment. The district court granted the plaintiffs relief with respect to the 1980 amendment, but denied their motion as to the 1982 amendment and entered summary judgment for the Secretary. ECGC and the County of Erie appealed from that portion of the judgment denying relief. We reverse.

## I. FACTS

### A. The Parties and Pennsylvania's Medicaid Program

ECGC is a non-profit, long-term care nursing home providing both skilled nursing and intermediate care services to approximately 550 elderly indigent patients in Erie, Pennsylvania. The Center maintains close ties with the plaintiff, Erie County, from whom it receives financial support. The County guarantees all of ECGC's indebtedness and is required to make up any shortfall in the Center's operating costs.

■ ECGC relies substantially on reimbursements provided by the State through the Medicaid program. *See* 42 U.S.C.A. § 1396 *et seq.* States are not required to participate in the Medicaid program but if a state chooses to do so, it must comply with applicable federal law. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65

---

1. The Secretary argues that ECGC should be pursuing its claims in the Pennsylvania Department of Public Welfare's Office of Hearing and Appeals (OHA), the arm of DPW responsible for adjudicating provider claims. Before proceedings commenced in the district court, ECGC had filed similar claims with OHA. On ECGC's motion, OHA stayed its administrative proceeding pending the outcome of this litigation. We note, however, that OHA's administrative appeal procedure does not allow providers to challenge

the validity of the State's reimbursement methodology and we have upheld the validity of this procedure. *West Virginia Univ. Hosps., Inc. v. Casey,* 885 F.2d 11, 23 (3rd Cir.1989), *aff'd in part,* —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). In addition, OHA informed ECGC that any adjudication by OHA would be incomplete because it had no jurisdiction over the Secretary. Thus, ECGC would be unable to obtain complete relief in an administrative proceeding.

L.Ed.2d 784 (1980). The Medicaid statute requires each participating state to submit a state plan containing a comprehensive description of the nature and scope of the state's Medicaid program for approval by the Secretary. 42 U.S.C.A. § 1396a(a). A state submits its plan to the Health Care Financing Administration (HCFA), the agency within HHS that Congress has designated to administer the Secretary's Medicaid responsibilities at the federal government level. Upon HCFA's approval of the plan, a state is entitled to federal government reimbursement for a percentage of the funds it has paid to health care facilities servicing Medicaid recipients. 42 U.S.C.A. § 1396b(a). Medicaid programs are administered by states, not the federal government, and so long as a state complies with the requirements of the Medicaid Act, "it has wide discretion in administering its local program." *Lewis v. Hegstrom,* 767 F.2d 1371, 1373 (9th Cir.1985).

In Pennsylvania, the Department of Public Welfare is the agency charged with administering the Medicaid program. Under Medicaid, the State reimburses county nursing homes for their actual allowable costs on a per diem basis up to a ceiling set by DPW. The method that DPW selects for calculating payment rate ceilings can have a substantial financial impact upon nursing home facilities; if the payment rate for a particular facility is less than its actual costs, the facility loses money. In turn, in the case of ECGC, Erie County must make up the fiscal shortfall.

### B. The 1980 Amendment and the "Rule of Three"

Prior to 1980, the Medicaid statute required that a state plan provide reimbursement to SNFs and ICFs "on a reasonable-cost related basis," as determined in accordance with methods and standards developed by a state and cost-funding methods approved and certified by the Secretary. Under this standard, Pennsylvania reimbursed county nursing homes for their actual allowable costs subject to a ceiling based on the statewide weighted average of daily allowable costs for all county homes.

In 1980, in response to rapidly rising medical costs, Congress enacted section 962 of the Omnibus Budget Reconciliation Act, Pub.L. No. 96–499, § 962(a), 94 Stat. 2650 (1980), commonly referred to as to the Boren Amendment, amending 42 U.S.C. § 1396a(a)(13)(A) to provide:

> for payment of the skilled nursing facility and intermediate care facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

In enacting the Boren Amendment, Congress had two purposes in mind:

> (1) to provide the states with greater flexibility in developing methods of reimbursing skilled nursing facilities, intermediate care facilities, and inpatient hospital services; and (2) to increase the economy and efficiency of all plans. S.Rep. No. 139, 97th Cong., 1st Sess. 478, *reprinted in* 1981 U.S.Code Cong. & Admin.News 396, 744.

*Pinnacle Nursing Home v. Axelrod,* 928 F.2d 1306, 1310 (2d Cir.1991). The Amendment also introduced into the eligibility requirement for payment that the provider's facility be "effectively and economically operated" and that the provider's care services be "in conformity with applicable State and Federal laws, regulations, and quality ... standards."

Pennsylvania amended its medical assistance plan in 1980 to group county facilities for reimbursement purposes according to Standard Metropolitan Statistical Areas (SMSAs), borrowing a concept from the system employed by the United States Census Bureau for classifying, according to population size, metropolitan and rural areas throughout the nation. The Census Bureau classified the most populous re-

gions in Pennsylvania as SMSAs II, less populous areas as SMSAs III through SMSAs V. Rural areas were classified as non-SMSAs. The state plan under the 1980 amendment called for dividing the 41 county facilities into SMSAs and then calculating the per diem payment rate ceiling by finding the average of the daily allowable costs of the facilities in each SMSA group. Thus, instead of establishing a single statewide payment rate ceiling applicable to all county nursing homes, the State established separate rate ceilings for each SMSA group.

When DPW first submitted the 1980 proposed amendment to the state plan for approval to HCFA, the federal agency denied approval and sent DPW a memorandum discussing the problems with the proposal. In particular, for purposes of this case, HCFA questioned the change from statewide to SMSA grouping:

> The State must ... explain why it feels the new rate represents a more reasonable definition of the level of cost at which efficient and economical facility services are deliverable. Further, we note the limited number (41) of county facilities. The State should be advised that a change in the ceiling level of reimbursement based on SMSA may be unreasonable unless there are sufficient facilities within the group to establish valid measures of central tendency.[2]

DPW responded that it had anticipated HCFA's concern with central tendency in the SMSA grouping plan, and had met the problem by amending its plan so that the ceiling rate for any SMSA group containing fewer than three facilities would be computed in combination with a more populous SMSA group. Evidence shows, however, that there would be no groups containing less than three members because the smallest group would consist of exactly three members. ECGC and the County have dubbed the State's approach in the 1980 amendment "the rule of three" because the State assumed that a group containing three members was sufficiently large to

guarantee statistically valid rate-setting results. HCFA ultimately approved the State's plan, as amended, without any further inquiry into the validity and reliability of the State's reimbursement methodology. The 1980 amendment was effective October 1, 1980.

### C. The 1982 Amendment

Pennsylvania's 1982 amendment to its medical assistance plan, which affected ECGC during the period July 1, 1982, through June 30, 1984, retained the SMSA grouping framework introduced by the 1980 state plan amendment, but changed the methodology by which DPW calculated the per diem payment ceiling for each SMSA group. Under the previous state plan, DPW set the payment ceiling by aggregating the year-end reported net operating costs of all facilities in a SMSA group and finding the mean, or weighted average, of per diem costs of the facilities in the SMSA group. The 1982 amendment retained the same formula for rate setting but adopted the median per diem operating costs in each SMSA group rather than the mean. Thus, the reimbursement methodology in the state plan remained intact, including the "rule of three," except for the switch from the mean to the median.

Before proposing the 1982 amendment, DPW conducted an analysis comparing the use of the mean and the median in setting rates for nursing homes, and concluded that the median was a more accurate measure of the central tendency of facility costs. The DPW study, however, yielded no statistical measure with respect to the validity or reliability of the use of a median-based reimbursement measure for SMSA groups with only three facilities. DPW submitted its assurances to HCFA along with the related information required by the Medicaid regulations, informed HCFA of the State's switch to the median, and assured HCFA that its plan's payment rates were "reasonable and adequate" in accordance with the Medicaid Act. After some brief correspondence, none of which

---

**2.** Central tendency is "a value (as the mean or median) representative of an entire statistical distribution." *Webster's Third New International Dictionary, Unabridged* (1966).

concerned the reimbursement methodology, HCFA approved the amendment.

The SMSA grouping system substantially altered the number of county facilities with which the State compared ECGC for reimbursement purposes. Before the 1980 amendment, the State compared ECGC with 47 other county facilities. From October 1, 1980, to July 1, 1981, the State compared ECGC with the 22 other county facilities in SMSA group II, the SMSA group in which ECGC was placed initially. During the period July 1, 1981, through June 30, 1984, the relevant period for purposes of this litigation, DPW reimbursed ECGC according to its computations for county nursing homes in SMSA group III which contained only three county facilities. Moreover, not all of the three county facilities were similar in size, age, number of patient days of service, and, because of difference in location and extreme winter conditions in Erie, heating costs.

### D. The District Court's Decision

In the district court, ECGC and the County challenged the Secretary's approval of both the 1980 and 1982 state plan amendments which included the "rule of three" methodology. They contended that the "rule of three" was unfair and statistically invalid, and that the State's adoption of the 1980 state plan implementing the "rule of three" was primarily a result of influential political lobbying on behalf of large Pennsylvania counties that stood to benefit financially from the SMSA grouping method. ECGC and the County sought a declaratory judgment that the Secretary improperly approved the amendments.

The district court agreed that the Secretary improperly approved the 1980 plan amendment. It reasoned that the Secretary failed in his duty under the Medicaid Act, as it existed in 1980, "to review, approve and verify the state's methodology for reimbursing county nursing homes." The court faulted the Secretary's approval of the 1980 amendment, particularly because no state or federal agency had attempted to ascertain if placing county nursing homes in groups containing as few as three homes would produce rate ceilings that reimbursed those facilities on a rea-

sonable and adequate basis. The court entered summary judgment for ECGC and the County on this issue and the Secretary did not appeal.

With respect to the 1982 amendment, however, the district court entered summary judgment in favor of the Secretary. ECGC and the County argued that once the district court struck down the 1980 amendment implementing the "rule of three" method for setting payment rate ceilings, the 1982 amendment, which preserved the same methodology but merely incorporated a different measure of central tendency, was likewise impermissible. The court rejected this argument, stating that Pennsylvania made the required findings and assurances to the Secretary in 1982, and the State's assurances were supported by its statistical study showing the preferable use of the median measure for computing reimbursement. Therefore, the court concluded, the Secretary's approval of the 1982 plan was not arbitrary and capricious under the Boren Amendment standard for federal review of state plan amendments.

## II. THE VALIDITY OF THE SECRETARY'S APPROVAL OF PENNSYLVANIA'S 1982 STATE MEDICAL ASSISTANCE PLAN AMENDMENT

### A. The Medicaid Act State Reimbursement Provision

The provision in the Medicaid Act addressing the reimbursement methodology allowed in state medical assistance plans has undergone some change since Congress initially enacted the Act in 1965. *See generally, Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, ——, 110 S.Ct. 2510, 2515, 110 L.Ed.2d 455 (1990). At its inception, the Act required states to provide reimbursement for the "reasonable cost" of in-patient services that facilities rendered to Medicaid recipients. *Id.* In 1972, Congress altered this "reasonable cost" standard to give states more flexibility to develop methods and standards for reimbursement. *Id.* Under the Act, as amended, states were required to reimburse Medicaid facilities on

a reasonable cost basis "as determined in accordance with methods and standards which shall be developed by the State and reviewed and approved by the Secretary." Pub.L. No. 92–603, § 232(a), 86 Stat. 1329, 1410–11 (1972). The Secretary judged Pennsylvania's 1980 proposed amendment by this standard.

In 1980, Congress, in a laudable effort to contain escalating Medicaid costs and reduce potentially stifling and expensive federal oversight of state methodologies, enacted the Boren Amendment, creating a new standard for reimbursement of nursing and intermediate care facilities. *West Virginia Univ. Hosps., Inc. v. Casey*, 885 F.2d 11, 23 (3rd Cir.1989), *aff'd in part*, —— U.S. ——, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991). The Boren Amendment modified the state reimbursement provision to require states to provide reimbursement to SNFs and ICFs through the use of rates *"which the State finds, and makes assurances to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."* Pub.L. No. 96–499, § 962(a), 94 Stat. 2650 (emphasis added).[3]

The Secretary reviewed Pennsylvania's 1982 plan amendment under the Boren Amendment standard. In 1982, the Medicaid regulations required the State to submit "assurances" to the HCFA that it had made findings that its plan's methods and rates provided reasonable and adequate reimbursement to facilities servicing Medicaid recipients. 42 C.F.R. § 447.255(a) (1982).[4] The regulations thus did not require the State to submit its findings, but only to accompany its assurances with "related information." *Id.* § 447.255(b). The regulations then required HCFA to review the related information which pertained to the significant effect the change in payment rates would have on the availability of the relevant health care services, type of care and extent of provider participation, and the degree to which costs were covered in facilities serving a disproportionate number of indigent patients with special needs. *Id.* § 447.256(a).[5] In 60 days, HCFA was to inform the state agency whether the agency's assurances regarding proposed rates were acceptable. *Id.*

■■■■ Our task is to determine whether, under the 1982 Medicaid provisions, the Secretary's approval of Pennsylvania's 1982 medical assistance plan amendment was arbitrary, capricious or manifestly contrary to the purposes of the Medicaid Act. *See New York by Perales v. Sullivan*, 894 F.2d 20, 24 (2nd Cir.1990). Because we review an administrative decision made by the Secretary, whom Congress has entrusted to administer the Medicaid statute, we accord substantial deference to his view of the regulations he has promulgated to fill any gap left, explicitly or implicitly, by Congress in the statute. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Connecticut Dept. of Income Maintenance v.*

---

**3.** Congress originally applied the Boren Amendment standard to state reimbursement rates for SNFs and ICFs. The following year, Congress extended the Boren Amendment standard to state reimbursement rates for hospitals. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, § 2173, 95 Stat. 357, 808 (1981).

**4.** DPW submitted its proposed plan amendment, including the "assurances," to HCFA in a letter dated September 29, 1982. HCFA approved the amended plan on November 24, 1982. Thus, the pertinent regulations are those effective October 1, 1982. The 1982 regulations contained no changes from the 1981 regulations germane to the issues in this case.

**5.** "Related information" included,

(1) The amount of the average proposed payment rate for each type of provider ... and the amount by which that average rate increased or decreased relative to the average payment rate in effect for each type of provider for the immediately preceding rate period;
(2) A quantified estimate of the short-term and, to the extent feasible, long-term effect the change in the rate will have on—
(i) The availability of services on a Statewide and geographic area basis;
(ii) The type of care furnished (for example, secondary or tertiary care);
(iii) The extent of provider participation; and
(iv) The degree to which costs are covered in hospitals that serve a disproportionate number of low income patients with special needs.
42 C.F.R. § 447.255(b) (1981).

*Heckler,* 471 U.S. 524, 532, 105 S.Ct. 2210, 2214, 85 L.Ed.2d 577 (1985). In reviewing the district court's summary judgment order in favor of the Secretary, we exercise plenary review over the court's interpretation of legal precepts and its statutory construction. *Bechtel v. Robinson,* 886 F.2d 644, 647 (3rd Cir.1989).

### B. Scope of the Secretary's Review under the Boren Amendment

Our threshold determination is to ascertain what Congress intended under the Boren Amendment as the proper scope for the Secretary's review of state medical assistance plans. The Secretary argues that Congress intended the Boren Amendment to substantially reduce his function in reviewing state plans; that it eliminated the requirement for detailed federal review of state payment methodologies and substituted a very limited federal review function. The Secretary asserts that under the Medicaid regulations, a state is required only to supply assurances and related information and that he is obligated only to evaluate the reasonableness of the assurances in light of this related information. He further asserts that his role in approving state plan amendments is not to validate through close technical analyses that the states' methodology actually meets the federal requirement of "reasonable and adequate" payment rates to "efficiently and economically operated" providers. *See* 48 Fed.Reg. 56,046, 56,052 (1983) ("the federal review procedure is not directed toward judging or validating a State's payment methods and standards from a technical standpoint"). The district court agreed with this construction.

Under this view of the Boren Amendment, HCFA's review function would be hardly more than ministerial and would not provide any federal oversight into the "reasonableness and adequacy" of the states' Medicaid reimbursement rates. We do not read so sweeping a circumscription of federal authority and so sharp an escalation in state power in the language of the Boren Amendment. On the contrary, the congressional history reveals Congress' intention only to reduce the Secretary's "potentially stifling and excessive federal oversight of state methodologies," *West Virginia Univ. Hosps. v. Casey,* 885 F.2d at 23, in advance of the submission of a state plan amendment, but not to eliminate entirely his ultimate review function into the reasonableness and adequacy of the states' payment rates. The House Conference Committee Report explaining the Boren Amendment explicitly noted that the final authority of the Secretary to approve or disapprove rates of reimbursement remained intact. The report stated that "while the States have discretion to develop the methods and standards on which the rates of reimbursement are based, the Secretary retains final authority *to review the rates* and *to disapprove those rates if they do not meet the requirements of the statute.*" H.R.Conf.Rep. No. 1479, 96th Cong., 2nd Sess. 154 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5903, 5944 (emphasis added).

In addition, in 1981 when Congress extended the Boren Amendment standard to state reimbursement of hospitals, the committee report accompanying the bill confirmed Congress' expectation that the Secretary would ensure state compliance with the Medicaid statute. *See,* S.Rep. No. 139, 97th Cong., 1st Sess. 478 (1981), *reprinted in* 1981 U.S.C.C.A.N. 396, 744 ("The committee expects that the Secretary will keep regulatory and other requirements to the minimum necessary *to assure proper accountability. . . .* It is expected that the assurances made by the States will be considered satisfactory in the absence of a *formal finding to the contrary by the Secretary.*") (emphasis added). The Supreme Court has interpreted the foregoing legislative history to mean that,

> [b]y reducing the Secretary's role in *establishing* the rates, Congress intended *only* that the *primary* responsibility for rates be transferred to the States; the Secretary was still to *ensure compliance with the provision.*

*Wilder,* 496 U.S. at ——, 110 S.Ct. at 2521 (citations omitted) (emphasis added). Otherwise, none of the state plans would be subject to any requisite federal overview

and states would possess absolute power to fix rates of reimbursement. Thus, the Secretary is unduly modest and, indeed, incorrect in concluding that the Boren Amendment emasculated his power to review and approve state payment rate methodologies. Although Congress introduced greater flexibility for states to develop payment rates by limiting federal oversight in the *development* of state plans, it left undisturbed the Secretary's authority to *approve or disapprove* state payment methodologies when submitted for review.

■ Regardless of a state's obligation under the Boren Amendment to make assurances to HCFA that it has complied with Medicaid statutory requirements and regulations, HCFA still has the final responsibility to evaluate the assurances "to determine whether the State has made a finding to substantiate that the payment rates are reasonable and adequate." 48 Fed.Reg. at 56,052. *See also id.* ("HCFA's approval of a state plan amendment indicates that the State has complied with the requirements in the statute and regulations."). Although containment of the soaring cost of health care in this nation is to be commended and encouraged, the effectiveness of the Medicaid program depends, *inter alia,* on a federal review process which assures payment to providers of reasonable and adequate rates. The Secretary's review obligation under the Boren Amendment is not, as he contends, to focus simply on the states' assurances of compliance without examining the bases underlying those assurances. Otherwise, the states' assurances assume the function of unreviewed finality.

■ The Secretary argues that the regulations do not compel states to submit the findings or the underlying data used to support their assurances. *See id.* at 56,-050. He asserts that this is evidence that he is not required to request and examine

such information to ensure that a state's plan reimburses facilities with reasonable and adequate rates. But the Secretary's conclusion does not necessarily follow from his predecessor's declination to adopt such a procedure. Rather, the commentary accompanying the publication of the final regulations explains that HHS did not believe that the reporting of more background data would aid the federal evaluation of an individual state's assurances because the information that a state included might not in itself necessarily be indicative of reasonable and adequate rates. *Id.* In addition, the commentary points out that, if necessary, HCFA could request additional background information from an individual state "in order to *complete review of an individual state's assurances." Id.* (emphasis added). Thus, states may submit their assurances of reasonable and adequate payment rates without substantiating information, but the Secretary is obliged to ensure that each state complies with the statute by requesting data justifying an individual state's assurances when those assurances are suspect.

■ For the federal review provision of the Medicaid statute to have any meaning, the Secretary must be required to confirm, at the very least cursorily, the validity of states' assurances of reasonable and adequate payment rates. Otherwise, a state deliberately could submit false assurances that its amended plan provided reasonable and accurate rates, or even could submit assurances that were based, unbeknownst to the state, on faulty statistical "findings." Under the Secretary's viewpoint, as long as the submitted assurances and related information were facially convincing, he could accept the State's amendment.[5] We perceive no plausible reason to read the Medicaid Act "to reduce the Secretary's review of rates fixed by the states to a *pro forma* procedure that will nearly always result in his automatic imprimatur." *New*

---

5. In fact, at oral argument, counsel for the Secretary had difficulty articulating any manner in which the Secretary could prevent the acceptance of such false assurances by a state, other than that the Secretary would reject the state's plan if he *knew* that the state findings underlying the assurances were unsound or incorrect.

Accepting the Secretary's conceptualization of his responsibilities under the Boren Amendment, which allows for no federal consideration of the findings underlying a state's assurances, it is difficult to see how the Secretary would learn that the methodology underlying the state's plan was deficient.

*York by Perales v. Sullivan*, 894 F.2d at 24. Such a procedure would eviscerate the federal oversight still retained in the Boren Amendment and result effectively in no federal oversight at all. As the Supreme Court has observed,

> It would make little sense for Congress [under the Boren Amendment] to require a State to make findings without requiring those findings to be correct. In addition, there would be no reason to require a State to submit assurances to the Secretary if the statute did not require the States' *findings to be reviewable in some manner by the Secretary*. We decline to adopt an interpretation of the Boren Amendment that would render it a dead letter.

*Wilder*, 496 U.S. at ——, 110 S.Ct. at 2518 (emphasis added). We therefore reject the Secretary's attenuated interpretation of his responsibility to review state medical assistance plans under the Boren Amendment.[6]

### C. The Validity of the Secretary's Approval of Pennsylvania's 1982 Amendment.

■ We now examine whether the Secretary contravened his obligations under the Act in approving Pennsylvania's 1982 amended plan. Only one other court has addressed the validity of the Secretary's approval of a state's reimbursement methodology for which the state had not made appropriate supportive findings. In *Pinnacle Nursing Home v. Axelrod*, the State of New York amended its procedure for calculating Medicaid reimbursement and submitted assurances of reasonable and accurate rates to the Secretary without making the requisite findings mandated by the Boren Amendment. 719 F.Supp. 1173 (W.D.N.Y.1989), *aff'd*, 928 F.2d 1306 (2nd Cir.1991). The Secretary accepted the State's assurances and approved the amendment. The court granted plaintiffs' motion requesting a declaration that the Secretary adopted the adjustment in violation of federally mandated procedure because the assurances submitted by the State were "utterly insufficient to justify approval of the plan amendment." *Id.* at 1182.[7]

When DPW assured HCFA that the State's 1982 amended plan accorded with the "reasonable and adequate" standard of 42 U.S.C. § 1396a(a)(13)(E), the Medicaid statute required this assurance to encom-

---

**6.** There is scant support for the Secretary's contention that he properly may approve amendments to a state plan even though the state has no reasonable basis for its assurance that the plan allows for reasonable and adequate reimbursement. *See California Hosp. Ass'n v. Schweiker*, 559 F.Supp. 110 (C.D.Cal.1982), *aff'd mem.*, 705 F.2d 466 (9th Cir.1983). In *California Hospital Association*, the district court held that the Secretary's post-Boren Amendment approval of a California Medicaid plan amendment was proper even though the State had not made appropriate findings to substantiate its assurances of reasonable and adequate rates. *Id.* at 116–17. Although the Ninth Circuit Court of Appeals affirmed without an opinion, the district court did no more than cursorily analyze the Medicaid act and regulations and made no reference to the legislative history pertaining to the Boren Amendment.

In addition, one court has described HCFA's review of state Medicaid plans as "cursory at best ... [i]n essence ... limited to whether the 'documentation submitted by the State Medicaid Agency complies with procedural requirements.'" *AMISUB (PSL), Inc. v. Colorado Dep't of Social Servs.*, 879 F.2d 789, 794 (10th Cir. 1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3212,

110 L.Ed.2d 660 (1990). However, the Secretary admits that this characterization is too extreme, and that agency review under the Boren Amendment is not exclusively procedural.

More recently, we referred to the regulations governing state receipt of federal Medicaid funding and, in passing, stated that "HCFA relies on the state's 'assurances' [of reasonable and adequate rates] and does not independently evaluate the adequacy of the rates." *See Temple Univ. v. White*, 941 F.2d 201, 208 (3d Cir.1991). In *Temple*, we reviewed the validity of Pennsylvania's 1988–1989 medical assistance plan payment rates. Unlike the instant case, however, the Secretary was not a party to the action and the scope of his review functions was not at issue.

**7.** The Secretary was a party in the district court but not on appeal. The Second Circuit Court of Appeals affirmed the district court's finding that the State's assurances were defective, and stated that its holding was buttressed by the Secretary's decision not to join in the appeal. *Pinnacle Nursing Home*, 928 F.2d at 1316 ("Had HCFA believed that the 1987 Adjustment complied with the Act, we assume that it would have joined in this appeal.").

pass all county facilities, including those in SMSA group III. However, there were no state findings substantiating this assurance with respect to this group. Although DPW had conducted a study comparing the use of the mean and the median, the analysis yielded no statistical measure regarding the validity or reliability of a median-based reimbursement methodology in the context of a SMSA grouping with only three facilities. In addition, DPW still had conducted no analyses verifying the validity and reliability of the "rule of three" as a basis for calculating payment rates. It failed to do so notwithstanding HCFA's previous expression of concern when DPW proposed the 1980 amendment that the limited number of county facilities might not be sufficient to "establish valid measures of central tendency."[8] *See* page 7 *supra*. Thus, DPW's assurance to the Secretary that the 1982 plan provided reasonable and adequate reimbursement to eligible facilities was merely a hollow recitation of the wording of the Medicaid statute.

■ When presented with the 1982 proposed amendment, the Secretary should have reviewed its effect on the state plan as it existed at that time. If he had fulfilled this statutory obligation, he would have been alerted from the face of the state plan, as he was in 1980, that the State's methodology was suspect as applied to county homes in those SMSA groups with only three facilities.[9] The Act required the Secretary to find satisfactory the State's assurance that its plan provided reasonable and adequate reimbursement for *all* economically and efficiently operated facilities. Because the State's plan included a questionable method for calculating reimbursement to county nursing homes, namely the "rule of three," the Secretary should not have been satisfied with the State's assurance of its compliance with the "reasonable and adequate" statutory dictate. Had the Secretary carried out his duty to ensure Pennsylvania's compliance with the Medicaid statute, he would have withheld approval of the 1982 amendment. His failure to do so was arbitrary and capricious. We therefore hold that when a state medical assistance plan contains a facially suspect methodology for payment rates under the Medicaid program, the Secretary should not approve the plan without first fulfilling his obligation to require the state to substantiate its assurances that the rates are reasonable and adequate to meet the costs incurred by efficiently and economically operated facilities.

## IV. CONCLUSION

To be satisfied with a state's assurance that its method for determining reimbursement rates results in reasonable and adequate reimbursement to eligible facilities as required by the Medicaid Act, the Secretary must be convinced that a state has

8. The uncontradicted study of ECGC's expert statistician, Dr. David Kriska, shows that the State's 1982 scheme for calculating payment rates based on the "rule of three" did not result in reasonable and adequate reimbursement to county homes in SMSA groups with only three facilities. The analysis shows that the State's methodology provided imprecise estimates of the typical costs of county facilities in the SMSA group III class to which ECGC belonged because of the statistical unreliability associated with an estimate using a small sample size of only three rates. In addition, Dr. Kriska's report suggests that the State's 1982 switch from the use of the mean to the use of the median to calculate per diem ceilings exacerbated the inaccuracies created by the rule of three because the median calculations did not account for the number of days of service provided by each facility.
We are not in a position to judge the adequacy of the "rule of three" methodology employed by the State in its 1982 plan. However, Dr. Kriska's report suggests that, had the Secretary requested the State to substantiate its assurance that it had made findings that its plan provided reasonable and adequate reimbursement, the State would have been unable to do so.

9. It is important to note that the Secretary has the authority under the Medicaid Act to withdraw approval of a state plan. 48 Fed.Reg. at 56,051; 45 C.F.R. § 201.3(c). This action may arise from the failure of a state to revise its plan in compliance with a new federal requirement. 58 Fed.Reg. at 56,051; 45 C.F.R. 201.6(a). Thus, although the Secretary had previously approved the Pennsylvania plan incorporating the "rule of three," he could have withdrawn his approval in 1981 if he had been dissatisfied by the State's assurance of compliance with the "reasonable and adequate" statutory requirement.

made findings that its rates do in fact provide such reimbursement. Because Pennsylvania's 1982 amended plan for calculating payment rates was based on facially suspect methodology, the Boren Amendment required the Secretary to disapprove the plan and request State substantiation to its assurance. The Secretary's failure do so was arbitrary and capricious. Accordingly, the district court's entry of summary judgment will be reversed and the case remanded with instructions to enter a declaratory judgment in favor of the Center and the County. Costs taxed against appellees.